John PUMA, Plaintiff,

v.

J. Willard MARRIOTT et al., Defendants.

Civ. A. No. 3275.

United States District Court, D. Delaware.

Aug. 17, 1973.

Ernest S. Wilson, Jr., of Wilson & Russell, Wilmington, Del., and Stanley L. Kaufman and Allan K. Peckel, of Kaufman, Taylor, Kimmel & Miller, New York City, for plaintiff.

R. Franklin Balotti, of Richards, Layton & Finger, Wilmington, Del., and Frank H. Strickler, of Whiteford, Hart, Carmody & Wilson, Washington, D. C., for defendants, Marriott Corp. and Don G. Mitchell.

David F. Anderson, of Potter, Anderson & Corroon, Wilmington, Del., and Burton A. Schwalb, of Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for various individual defendants.

## OPINION

CALEB M. WRIGHT, Chief Judge.

This is a derivative stockholders' suit brought on behalf of Marriott-Hot Shoppes, Inc. (MHS) alleging violations of Sections 10(b) and 14(a) of the Securities and Exchange Act of 1934, 15 U. S.C. §§ 78j(b) and 78n(a) and Rules 14a–9 and 10b–5 promulgated thereunder. The plaintiff argues that the defendants utilized a false and misleading proxy statement to solicit shareholder approval for and effectuate MHS's purchase of six real estate companies from various members of the Marriott family and other corporate insiders. (Sellers).

The defendants fall into three categories: (1) directors and officers of MHS who were also owners of the real estate companies being acquired (J. Willard Marriott, Sr. (Marriott, Sr.), J. Willard Marriott, Jr., Alice Marriott, Milton Barlow (Barlow) and John S. Daniels); (2) members of the Marriott family who were owners of the real estate companies, and (3) Don G. Mitchell (Mitchell) one of the outside directors charged with negotiating the acquisition.

The case was submitted to the Court on the question of liability on the pleadings in this case and the trial transcript and exhibits from a companion case tried in the Delaware Chancery Court on a claim of a breach of common law fiduciary duties arising out of the same

transaction.[1] The record is substantially similar to the record on which the Court denied the plaintiff's motion for summary judgment.[2]

In essence, the plaintiff contends that the defendants controlled MHS and manipulated the corporation and the proxy mechanism to require MHS to procure the six real estate corporations at an inflated price with a substantial profit to themselves at a time when the companies were no longer attractive investments for the sellers. In addition to failing to disclose their ulterior motives and domination of the transaction, the proxy statement is allegedly materially defective in the following basic respects: 1) It fails to adequately and accurately describe the factors pertinent to the determination of the price, and 2) it fails to sufficiently illuminate the significance and magnitude in the overall transaction of one of the properties, Monument Properties, Inc. (Monument), a motor hotel in Philadelphia.

## THE FACTS [3]

In late 1964 and early 1965, in response to an increasing desire among MHS directors, particularly certain outside directors,[4] to obtain listing on the New York Stock Exchange, to eliminate various conflict of interest contractual relationships between MHS and certain Marriott family members and other insiders, and to prevent the sale of the properties to outside interests, certain officers of MHS and the Board of Directors (Board) commenced an investigation into the possibility of purchasing the real estate companies involved in the allegedly unfair acquisition. (Tr. 37–38, 254, 465–466, 469, 706, 708). On March 30, 1965, two outside directors, Mitchell and Louis W. Prentiss, were designated by the Board to negotiate the purchase of the six real estate companies.[5] The companies were all real estate companies owning land and buildings leased by MHS for utilization in its business, and were owned by members of the Marriott family and other corporate insiders. Upon inquiring into the prospect of listing on the NYSE, MHS officers were informed that plans for severing these affiliated leasehold relationships would be a prerequisite to listing and clearance from the Securities Exchange Commission (SEC).

The first phase of the investigation into the acquisition was obtaining appraisals on the several corporations.

1. Opinion of Vice Chancellor Short, 283 A.2d 693 (Del.Ch.1971).

2. 348 F.Supp. 18 (D.Del.1972).

3. Certain of the underlying facts regarding MHS and the acquisiton were discussed in the Court's earlier opinion and will not be reiterated herein unless relevant to the particular allegations of materially misleading statements and omissions.

In its earlier opinion, the Court indicated that the effect on this litigation of Vice Chancellor Short's findings of fact under the doctrine of collateral estoppel must be determined prior to any ultimate resolution herein. The plaintiff has not directly addressed himself to the estoppel issue in his briefs; however, from his repeated references to alleged factual circumstances contrary to those determined by the Vice Chancellor, it is clear that he assumes that the doctrine is inoperative.

The collateral estoppel issue is quite involved, especially in light of the parties' election to submit this case on the identical trial record before Vice Chancellor Short. However, after a review of the entire record, the Court concludes and finds all pertinent and relevant facts to be substantially similar to those determined in the Chancery Court proceedings. Therefore, the estoppel question need not be resolved.

4. The so-called outside or independent directors were individuals who neither owned the properties companies purchased nor were members of the Marriott family.

5. The six companies were Parkview Properties, Inc. (Parkview), a restaurant in the Philadelphia area; Sellers Real Estate Co. (Sellers), a restaurant in Washington, D. C.; Potomac Properties, Inc. (Potomac), a restaurant in Arlington, Va., and a leasehold interest in a restaurant in Richmond, Va.; Brentwood Properties, Inc. (Brentwood), a restaurant in Washington, D. C.; Kirkwood Properties, Inc. (Kirkwood) a restaurant in Fairfax, Va.; and Woodmar Realty, Inc. (Woodmar), a restaurant in Washington, D. C., and a wholly-owned subsidiary, Monument, the Philadelphia motor hotel.

Commencing in January of 1965 and continuing into the fall of 1965, the appraisal procedure was a complicated and on-going effort involving the provision of pertinent corporate records to the appraisers and, in certain instances, discussion and revising of appraisal figures subsequent to an initial submission. Frank C. Kimball (Kimball), MHS Vice President and General Counsel, in charge of acquisition and administration of real estate, was responsible for obtaining the appraisals. Appraisals were sought from a Mr. Carl H. Hink, Koones and Montgomery, and Jackson-Cross. In certain instances, three appraisals were obtained; in others, two; and in others, appraisals of portions of the owners' interests were sought and the remaining interests valued using either actual construction costs or by capitalizing rental income streams using the same discount rate and methodology employed by the appraisers. Although appraisals made pursuant to several methods were initially obtained, appraisals made under the income method were eventually utilized as more indicative of the market value of these types of properties.

Throughout the period during which the appraisals were being sought, Kimball, upon receiving a specific appraisal or set of appraisals, would make them available to Robert Koehler (Koehler), Vice President and Treasurer of MHS, Barlow and Marriott, Sr. In addition, Koehler compiled and up-dated a schedule of the appraisals and a corresponding schedule of the remaining assets and liabilities of the property corporations. These schedules were made available to the Board's representatives on a periodic basis.

Marriott, Sr. expressed considerable concern that the initial appraisals were too low and not a reflection of the fair value of the six companies. He suggested that Kimball and Koehler notify the appraisers and request re-appraisals in light of certain calculations and assumptions of replacement costs and rental income made by the appraisers which Marriott, Sr. felt were inaccurate. In addition, he requested that appraisals be obtained on the properties assuming that leases presently on the properties were renewed at their competitive rentals. Marriott, Sr. felt that such appraisals would be more reflective of the actual market value of the properties. Such suggestions, as well as various corrections sought by Koehler and Kimball, were given to the appraisers, and amended appraisals were obtained.

On August 10, 1965, the outside directors of the Board voted to acquire the six property companies in a tax-free transaction "on the basis of appraised value of the real estate plus or minus assets and liabilities at July 25, 1965, in exchange for shares of Marriott-Hot Shoppes, Inc. common stock, said common stock to be valued at the price to be determined and approved by the outside directors . . . [on September 10, 1965] . . . ." PX-6.[6] The transaction would involve the tax free stock-for-stock exchange between MHS and the owners of Parkview, Potomac and Sellers (a "B" reorganization under § 368(a)(1)(B) Internal Revenue Code of 1954) and a statutory merger into MHS of Brentwood, Kirkwood and Woodmar (Section 368(a)(1)(A) Internal Revenue Code of 1954). In addition, the Board decided to retain outside counsel to review the transaction and advise the outside directors regarding the legality and appropriateness of the transaction.

On August 13, 1965, Ansel Luxford, an attorney and partner of the firm of Pehle, Mann, Riemer and Luxford, was employed as counsel for the outside directors. An expert on most of the economic and legal aspects of acquisitions and mergers of this nature, Luxford was to review and examine all pertinent data and render an opinion on the economic and legal propriety of the transaction.

---

6. The tentative proposed compensation was, on that date, 350,000 shares, and the tentative stock price, $23.00 per share. Tr. 122.

Luxford specifically disclaimed any expertise on the question of the valuation of the MHS stock and the magnitude of a blockage discount, and recommended the employment of an expert in that field. After thoroughly examining and analyzing the appraisals in light of methodology and existing market conditions, Luxford concluded that a price between 300,000 and 400,000 shares would be reasonable. He prepared a written report for the outside directors and discussed his conclusions with them at the September 10, 1965 directors meeting. In essence, Luxford felt that the appraisals were most conservative and significant only as a starting point in any determination of fair market value. In his opinion, the appraisers had failed to consider numerous factors pertinent to a realistic determination of a fair price between a willing seller and a willing buyer.[7]

In response to Luxford's request, Merrill, Lynch, Pierce, Fenner and Smith, Inc., (Merrill-Lynch) was retained to ascertain the fair market value of a block of 350,000 shares of MHS common stock. Merrill-Lynch concluded that although the stock was currently trading at $25\frac{3}{4}$ bid—$26\frac{1}{4}$ asked, a block of that size could only be successfully offered through a secondary offering by an underwriting group with a net compensation to the corporation of $20.65 per share at an approximate 20% blockage discount.[8]

On September 10, 1965, the outside directors met separately to consider the acquisition and merger. After a discussion with Luxford, they voted unanimously to acquire the assets of the six corporations with a net appraised value of $7,760,006 in exchange for 375,000 shares of stock valued at $20.69 per share[9]. In the subsequent week, it was discovered that there had been an erroneous deletion of a liability of approximately $223,000 for deferred tax obligations from the Monument valuation, and Koehler's schedules were amended to correct this oversight.

On October 13, 1965, the total compensation was reduced to 313,000 shares of stock. This reduction was suggested by the sellers, particularly J. Willard Marriott, Jr., as a result of a several dollar increase in the price of MHS common stock. Although the outside directors, and Luxford, did not feel that such a reduction was mandated, the directors accepted the offer. Simultaneously, the directors decided to re-determine the total appraised net value by utilizing the average of the high and low appraisals rather than the high appraisals which had been used previously, and reduced the blockage discount from 20% to $17\frac{1}{2}$%. The resulting net appraised

7. As an adjunct to this opinion, Luxford testified that appraisals of this nature are rarely utilized as a final determination of price and are most frequently employed by financial institutions for evaluating the advisability of financing a transaction and taking the appraised property as security. Their more conservative approach, although perhaps prudent for such financing institutions, allegedly bears slight relationship to the price the market would demand.

8. Merrill-Lynch enumerated the following as pertinent to its analysis:
   In making our evaluation, we have considered the size of this block of stock in relation to the volume of trading in the stock in the over-the-counter market, the general market conditions prevailing, the price action of the stock over the past several months, the industry outlook and the general investor demand for securities of this quality at this time.
   In addition, we have studied a selection of comparable size common stock offerings and have examined the ranges of gross spreads and expenses involved in registered offerings for companies comparable to Marriott-Hot Shoppes. We have also analyzed the detrimental effect of the announcement, registration and offering of similar size blocks of common stock upon the existing markets in these stocks—particularly the ones with fairly thin markets with stock concentrated in a few small areas.

9. This price did not include 248,910 shares which would be exchanged for an equal number of MHS shares owned by Brentwood and Kirkwood.

value was $7,082,000 and the MHS stock was valued at $22⅝ per share.

The transaction was submitted to and approved by the shareholders on November 9, 1965 and was closed on January 4, 1966.

The plaintiff has made continued and frequent assertions that the Marriott family, particularly Marriott, Sr., dominated the management and Board, dictated the nature and terms of the acquisition to obtain an excessive price, and specifically initiated the purchase to alleviate himself and family of undesirable and unprofitable investments through contained ownership of the six property companies. In addition, he contends that by including the several restaurant properties, Marriott, Sr., structured the transaction to obfuscate the importance of the Philadelphia motor hotel and divert shareholder attention from a substantial short term profit thereon. As the Court indicated in its prior opinion, the veracity of these accusations would be most significant to resolution of the issues raised by the plaintiff, particularly the question of the materiality of various alleged misstatements and omissions.

## THE APPLICABLE LEGAL STANDARDS

Section 10(b) and Rule 10b–5 deal with manipulative and deceptive devices in connection with a purchase or sale of a security and Rule 10b–5 makes it unlawful, in connection with the purchase or sale of a security, to make any untrue statement of material fact or omit to make a statement of material fact necessary to make the statements actually made not misleading. Section 14(a) concerns the requirements of proxy statements and Rule 14a–9 makes it illegal to solicit a proxy through a communication which contains a statement which is materially false or misleading or contains a material omission.

Since the plaintiff's claims under both sections arise out of a single allegedly defective proxy statement, the alleged misstatements and omissions pertinent to either section are identical. In addition, the test for application of the legal standard of materiality would appear to be the same. Cf. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) and Affiliated Ute Citizens v. United States, 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Thus, while there may be some difference between the elements of proof to establish individual liability under Rule 10b–5, e. g. Scienter, see Shemtob v. Shearson, Hammill & Co., 448 F.2d 442 (2nd Cir. 1971) and Herpich v. Wallace, 430 F.2d 792 (5th Cir. 1970), but cf. Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. denied 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), and Rule 14a–9, e. g. Negligence, see Gertsle v. Gamble-Skogmo, Inc., 478 F.2d 1281, (2nd Cir. 1973) and Gould v. American Hawaiian S.S. Co., 351 F.Supp. 853 (D. Del.1973), the factual determinations and the evaluation of the issue of materiality may be made simultaneously.[10]

■ The pertinent inquiry in the determination of the materiality of a misstatement or omission has been delineated as "whether a shareholder might have considered [it] to be important in the making of this decision." Affiliated Ute Citizens v. United States, *Id.*, see Mills v. Electric Auto-Lite Co., *Id.*, (reasonable propensity to affect the voting process). Materiality cannot be established on the basis of trivial or insignificant defects, or those only tangentially related to the transaction for which the proxy is solicited. Mills v. Electric Auto-Lite Co., *Id.*

10. The only discernable difference between the two rules on either of the issues is that Rule 10b–5 states that statements must be "untrue" and Rule 14a–9 prohibits "misleading" as well as "false" statements. However, in light of the fact that both Rules make misleading omissions actionable, the Court can perceive no substantive distinction between their respective coverage insofar as they apply to these two issues.

### THE ALLEGED MATERIAL MIS-STATEMENTS AND OMISSIONS

In the pre-trial order, the plaintiff cites ten separate major material misstatements and omissions which he alleges constitute violations of Rules 10b-5 and 14a-9. Also, throughout his discussion of these several defects, he makes numerous related statements and innuendoes regarding Marriott, Sr.'s actions and motives which allegedly constitute additional material misstatements and omissions. In the opinion of the Court, the fundamental deficiency in the plaintiff's argument is his reliance on the Marriott family's domination of the independent directors and the structuring of the transaction in the face of an absence of any proof of such control or action. To be sure, the Marriotts and other insiders owned in excess of 44% of the MHS stock and had effective control of the corporation. Nonetheless, the record is devoid of any evidence sustaining the plaintiff's allegations of domination and fairly sustains the defendants' contentions that the outside directors were acting independently in the interests of MHS and entered into and approved the transaction for reasons related solely to their perceptions of those interests. Almost without exception the plaintiff's analysis of the issue of materiality and his interpretation or attempted reconstruction of various factual occurrences and the motivations of the principals is undertaken in light of his underlying accusation against the Marriott family. Thus, his assertions and discussion concerning materiality are frequently merely hypothetical, and his factual inferences are without substantiation. As the Court indicated in its earlier opinion, although proof of the Marriott family's hegemony was not requi-

site to establishing a violation under the 1934 Act, the absence of such proof would significantly alter the question of the materiality of certain of the alleged defects.

■ The MHS shareholders were certainly entitled to be accurately apprised concerning the nature of the proposed transaction and afforded an adequate basis upon which to make an informed judgment on its acceptance or rejection. In short, they must be provided "within the four corners of the document [with] an intelligible statement of what the deal is all about." Feit v. Leasco Data Processing, 332 F.Supp. 544, 566 (E.D. N.Y.1971). In the opinion of the Court, the proxy statement provided the requisite description of the procedure through which the transaction was accomplished, the factors considered to be relevant and important to the independent directors, and the nature and value of the properties involved and the consideration paid therefor. Any misstatements or omissions were not significant or were too remotely related to the acquisition to be considered material.

■ The plaintiff's first alleged material defect is the omission of any reference to certain unfavorable tax and investment consequences to the sellers through continued ownership of the property companies.[11] In light of the Marriott family's reluctance to divest themselves of the primary diversification in their investment portfolio, the record is clear that these alleged unfavorable consequences did not enter into the negotiations and were not shown to be factors in the decisions of either the sellers or the independent directors. Since these factors were not aspects of the pricing mechanisms, and since they were not of sufficient magnitude to dissuade the sellers from continued owner-

---

11. The plaintiff cites a portion of a memorandum which was attached to the minutes of the September 10, 1965 Board meeting and entitled "Proposed Acquisition of Real Estate Companies Controlled by Certain Officers and Directors."

"The real estate companies have little personal tax advantages to the individual stockholders in that (a) depreciation is largely exhausted, (b) the tax shelter is becoming thin because of accumulated earnings, (c) complexity of many shareholders makes future expansion difficult."

ship of the properties, they were not material. The possibility that, if apprised of these factors, a shareholder might conclude that the sellers would be willing to sell for less, and, therefore, might oppose the transaction, does not render this omission material since such a conclusion is without factual support under the actual nature of the sellers' motives and the pricing mechanism.[12] Moreover, the fact that the proxy statement stresses the transaction's advantages to MHS does not necessitate the inclusion of the detriments to the sellers since the former were, in fact, pertinent to the transaction and considered by the independent directors in approving the acquisition and the latter were not relevant to the decisions of either the sellers or the independent directors.

■ The second alleged defect is the omission of the fact that the sellers could have sold a substantial part of their stock at full market price pursuant to SEC Rule 133. The proxy statement states:

". . . the Board, after considering the magnitude of the block of stock involved, the potential marketing costs and the investment warranties to which the stock will be subject has applied a blockage discount of 17.5% . . . . ."

■ The plaintiff contends it should adequately describe that the investment warranties did not limit the seller's right to alienate a substantial portion of the 313,000 shares. The parties have vigorously contested the availability of Rule 133 and the one per cent dribble rule, as well as, the total number of shares saleable thereunder. In light of the uncertain nature of the SEC's subsequent application of Rule 133 and the 1% dribble rule to this transaction, any reference to the exceptions to the specific warranties might have been mere speculation. Tr. 618–622. However, this dispute need not be explored, since the Court is of the opinion that the omission of any reference to the sellers' rights to sell some of their stock was not material. The above quoted statement regarding the blockage discount accurately enumerates the factors considered by the independent director in deciding on the 17.5% rate. The significant factor in selecting a blockage discount rate was undoubtedly Merrill-Lynch's expert opinion on the market value of a large block of MHS stock. Since the text of the proxy statement did not elaborate the scope of the specific investment warranties involved or indicate that the sellers would be precluded from selling any of the 313,000 shares, it was not necessary to delineate any possible exceptions or caveats to such warranties.[13]

■ Closely related to the above alleged omission, the third defect is the omission of the fact that Merrill-Lynch was not advised of and could not take into account the availability of Rule 133 and the saleability of certain stock thereunder. The plaintiff evidently misconstrues the nature of the Merrill-Lynch analysis. Merrill-Lynch determined the value of the 350,000 share block of stock by considering the relevant market and size of the sale and concluding that a secondary offering

---

12. This "possibility" is exemplary of the type of circumstance hypothesized by the plaintiff as a reasonable shareholder's reaction to various alleged omissions and misstatements. However, unless the "possibility" has some factual support or bears some relationship to the actual factors considered by the principals in consummating the transaction, it does not rise to the level of materiality or require inclusion in the proxy statement.

13. The only recitation of the nature of the warranties is in Exhibit II to the proxy which also contains a description of the possibility of an exception under Rule 133 in the same paragraph. PX–I, Ex. II, pp. II–4—II–5. In light of the fact that the specific details of the investment warranties are excluded from the proxy statement and included in Exhibit II thereto, the failure to include one aspect of these warranties in the proxy does not violate the "buried fact" doctrine to which the Kohn & American Metal Climax, Inc. case was, in part, directed. 458 F.2d 255 (3rd Cir. 1972).

would be required. It then calculated the net effect on the MHS stock from the probable impact of such an offering on the MHS market plus the brokerage and registration costs. After being advised of the nature of the transaction and the manner of the exchange, Merrill Lynch concluded that the proper procedure to ascertain value was utilization of such an hypothetical secondary offering. Such a procedure postulates the sale of the entire block of stock and anticipates the concomitant effect on the market price. Thus, the Court cannot perceive what effect the knowledge of the seller's right to alienate some of the stock would have been in light of Merrill Lynch's methodology. Since Rule 133 and the one percent dribble rule apparently would not have affected the Merrill Lynch opinion, the Court has no basis upon which to conclude that omission was material and finds that it was not.[14]

■ The fourth defect is the omission of the fact that the sellers demanded a tax-free exchange or an increase in the purchase price of $1,600,000 above appraised value to offset capital gains tax liability. In support of his contention that the defendant sellers would insist on 25% more in cash for a tax-free transaction and, in effect demanded that the public corporation pay their income taxes for them, Pl. Brief, p. 14, the plaintiff cites the testimony of Luxford, his report to the Board, and a draft of a letter written by Luxford in response to a shareholder who raised questions concerning the transaction. Tr. 397–401; PX–10, p. 3; and PX–88, p. 11. In fact, the draft letter was neither sent nor shown to any MHS personnel, and the testimony reveals that contrary to the plaintiff's blanket assertions, Luxford was never advised by MHS personnel that the Marriotts had demanded an additional 25% cash for a tax-free transaction. Luxford stated that he assumed as a matter of course and on the basis of his experience that if the transaction were taxable, the sellers would demand a higher price. He testified that such an occurrence was customary in merger discussions and done all the time. Tr. 399.[15] Thus, the plaintiff objects to the omission of a "fact" which was so generally accepted and widely-known fact-of-life in merger negotiations that Luxford assumed its existance without being told. See also Tr. 161. Moreover, his only evidence in support of the fact is Luxford's testimony based on an assumption.

The proxy statement clearly indicated that the transaction was tax-free and as a consequence thereof, MHS would take the properties at a $6,650,000 lower tax basis (approximately 4 million of which was non-depreciable real estate), and be entitled to a consequent lower tax deduction for depreciation and lower capital gains basis in the event of sale. Under the facts of this case, particularly the findings regarding the Marriott's reluctance to sell their property companies and the independent directors' feelings concerning the necessity for the acquisi-

14. In essence, the thrust of the plaintiff's argument appears to go more to the propriety of a blockage discount of the nature of the one recommended by Merrill-Lynch and the directors acceptance thereof rather than the proxy statement's deficiencies in that area.

15. The relevant portion of his testimony is as follows:

Q Yes; but did somebody say that to you, that if they had to pay a tax when they sold this property they wanted the public corporation to pay that tax?

A They wanted to give them a price. They wanted to give them a price that would restore them to their present position.

Q Did you have a discussion with anyone about this?

A No; I didn't need to.

Q You didn't need to?

A No. I'm accustomed—In this kind of a deal when you discuss an asset deal as against a tax free reorganization, what you're really talking about is the advantages versus the disadvantages, and one of the advantages from the corporation's point of view is that it gets up a stepped-up basis. One of the disadvantages when it pays cash is it's got to pay more cash to cover the tax factor.

tion, such disclosures were sufficient and the proxy statement did not have to contain a fact so widely known and obvious. See Richland v. Crandall, 262 F. Supp. 538, 554 (S.D.N.Y.1967).

The fifth alleged defect is the false statement that the price was adjusted downward since the transaction was tax-free. In support of this assertion, the plaintiff quotes the following sections from the proxy statement:

"In determining the advisability of the transaction and the *amount of the consideration,* the board of directors considered various factors * * *

"Second, the transaction will in the Company's view constitute a tax-free reorganization under the federal tax law and, since the tax basis of the properties which the Company will acquire in the transaction will thus be lower by approximately $6,650,000 than the aggregate of the fair market value (computed for these purposes at $22⅝ per share) of the stock being issued plus the mortgage encumbrances on the properties, the Company will have a lower tax deduction for depreciation and would also in the event of any future sale of such property, be required to report a higher taxable gain on sale." (emphasis supplied).

This quotation is comprised of a selective editing which represents at best a gross distortion of message contained in the proxy statement. The first sentence refers to three factors enumerated subsequently throughout the ensuing paragraph, and the latter statement is contained in a separate and immediately subsequent paragraph prefaced by the statement "[t]he board of directors also considered two other factors." The proxy statement contains no suggestion that the latter factor was specifically considered by the independent directors in reducing the total amount of compensation. Therefore, the plaintiff's assertion is meritless.

The sixth defect is the misleading and false description of the appraisal procedures. The proxy statement contains a limited reference to the appraisals, including them as one of three factors relevant to the determination of the advisability of the transaction and the amount of the consideration.

"First, independent appraisals of the real property owned by the six corporations were obtained. (There were two appraisals of each property. The aggregate difference between the higher and lower appraisals is approximately 7 percent. The board, after careful review, accepted the average of the higher and lower appraisals.")

The plaintiff argues that in some instances there were more than two appraisals and in others, at least portions of the property companies were not appraised at all. In addition, he contends that Marriott, Sr., improperly directed that the appraisals be increased by using hypothetical lease figures contrary to the actual leases as well as other figures not initially utilized by the appraisers.

The Court agrees that the statement concerning there being two appraisals on each property was false. However, it cannot agree that it was material. In addition, the Court is of the opinion that a more detailed description of the appraisal procedure was not requisite in light of the ultimate role of the appraisals in the determination of price, the manner in which it was actually described in the proxy statement, and the aggregate adjustments actually submitted.

The appraisal procedure was a long and complicated process which extended from January 1965 until mid-September, 1965. Initial appraisals were obtained pursuant to more than one method and in some instances contained erroneous figures for replacement costs and lease rental income. As a seller of the real estate properties and a

knowledgeable real estate manager and acquirer for MHS and his family, Marriott, Sr., was a logical and legitimate individual to examine and comment on the appraisals. The appraisers were acknowledged experts and were competent to accept or reject any suggestions from MHS management or Marriott, Sr. Moreover, Luxford, an expert on the subject, reviewed the appraisals and concluded that they were fair and, if anything, rather conservative. Tr. 320–321, 326, 363; PX-10, p. 4, see also Tr. 712. Any attempt to delineate the details of the appraisals would substantially complicate the proxy statement. An explanation of every appraisal, every amendment and the reasons therefor and every correction [16] over the nine month course of the appraisal procedure would be burdensome. See Tr. 60–61, 77–80, 107, 196–198, 199–200, 202, 208, 231, 336–337, 459–460, 486–487, 511–512, 662–665. Selection of certain elements from the process, the suggestion proposed by the plaintiff, could easily create a distorted overview of the procedure. It is clear that all principals treated the appraisals as a general, but conservative, guide to price. While utilized to attribute a market value to the property companies, they were not the sole factor pertinent to the decision of the independent directors to buy or the sellers to sell, and further description was not necessary. Had the defendants stressed Marriott, Sr., Luxford or the independent directors' opinions that the appraisals were low or other favorable aspects of the appraisals, their failure to enumerate other details might have been misleading. However, the addition of the various facts and innuendoes suggested by the plaintiff would not significantly clarify the proxy's depiction of the transaction or assist a shareholder in assessing the fairness or advisability of the acquisition.[17] The omission of the details of the appraisals was neither misleading nor material.

The seventh defect is the omission of any disclosure of the true basis upon which the independent directors initially approved the number of shares to be exchanged or the actual reasons for the reduction in the total number of shares from 375,000 to 313,000. The plaintiff asserts that the proxy statement creates the impression that the price decrease was the result of the sellers' generosity when it was, in fact, produced by other adjustments in the appraisal schedules and the shift from the high appraisals to the average of high and low appraisals. Once again, the Court is of the opinion that inclusion of the details of the appraisal procedure and the various phases of the Board's evaluation, tentative acceptance and final approval was not mandatory. The Court bases this conclusion on the fact that the five outside directors were in-

---

16. The plaintiff has repeatedly cited the fact that when the transaction was initially approved by the independent directors, the appraisal and asset-liability schedule included a $264,000 tax loss carry forward for Monument but did not include a $223,000 deferred tax liability for the same property. The record reveals that this represented an error on the part of MHS staff which was properly corrected before the final proxy statement was prepared and shareholder support sought, and that the $223,000 was included in the pricing procedure. Omission of this error was not material.

17. The plaintiff has asserted that in valuing the Parkview property, Koehler obtained two land appraisals, one of $400,000 and one of $200,000. He then added the cost of the newly constructed Parkview restaurant to the high appraisal to obtain one figure, but did not use the $200,000 figure and rather concocted one of his own to reach a second appraisal figure. The plaintiff completely misrepresents the nature of Koehler's calculations. Koehler did, in fact, utilize both land appraisals as starting points to determine the final figure. To each he applied the formula and figures used by the appraisers and computed the final figures. The resulting computations were less than $200,000 apart because of the necessity for discounting the present value of the real estate to determine the value of the owner's revisionary interest in the land. Such a procedure would reduce the absolute dollar differential.

dependent of the Marriott family and that recitation of these factors would necessarily unduly lengthen the proxy without materially elucidating issues pertinent to the question before the shareholders.

Moreover, once again, the plaintiff has mischaracterized the content of the proxy statement in his latter assertion regarding the reason for the price decrease. The proxy statement contains no statement specifically describing the reason for the price reduction, and the plaintiff's inferential reading is at best highly tenuous. However, the record fairly reflects that the primary and precipitating factor which permitted a reduction in the total compensation after the acquisition agreements had been signed was the sellers' offer to decrease the number of shares. Tr. 491–492, 672–673. As a consequence of and in conjunction with their acceptance of this offer, the directors made certain adjustments in the basis of their evaluation, most notably the shift to the average of high and low appraisals.[18] Thus, even if the proxy statement does give the implication that the price increase of MHS stock led to the reduction of 313,000 shares, it is not misleading.

The eighth defect is the omission of the fact that when Merrill-Lynch gave its valuation of the 350,000 block and the appropriate blockage discount, it was negotiating with the Marriott family to underwrite a large block of MHS stock. This assertion is contained in the affidavit of the plaintiff's attorney, Allan K. Peckel, filed in conjunction with his motion for summary judgment and in the plaintiff's trial brief, p. 29. The plaintiff has submitted no evidence to substantiate his accusation. The Court finds that the accusation is spurious and totally without factual support.

The ninth defect is the failure to disclose the fact that the independent counsel was, by his own admission, not qualified to evaluate the market value of the MHS block of stock. In light of the fact that on Luxford's request, the independent directors sought and obtained the opinion of an expert, Merrill-Lynch, which was acceptable to Luxford, the Court is of the opinion that the omission was not material.

The tenth defect is the failure to disclose and highlight the importance of the Philadelphia motor hotel and to reveal the profit made by the sellers on the recently constructed hotel facilities. In his brief, the plaintiff objects to the fact that MHS's credit was used to finance the 1961 construction of and 1964 addition to the motor hotel and points to portions of the proxy statement which he alleges present misleading and erroneous explanations for the sellers' profit and the companies' policy toward use of its credit to finance various construction. All of these omissions and misleading statements were allegedly designed to obfuscate Marriott, Sr.'s intention to unload an unattractive investment, the Philadelphia motor hotel, at an unconscionable profit, a finding which the Court specifically rejects.

The proxy statement presents an intelligible and accurate description of all seven properties. The fact that the Philadelphia motor hotel was not segregated for greater emphasis was not misleading since its importance in the transaction is clear from the proxy statement. All seven properties were evidently desirable locations and profitable and the acquisition of all seven was necessary to eliminate the conflict of interest problem and facilitate listing on the NYSE. Absent proof of the allegation concerning the Marriott family

18. The fact that in the interim between the September 10th and October 13th meetings the deletion of the $223,000 deferred tax liability was corrected certainly did not materially affect the reduction in price on a $7 million acquisition and would not have been material to the shareholders.

domination, the objections to the proxy statement's treatment of the Philadelphia motor hotel are without merit.

The plaintiff's contention that statements revealing the use of the company's credit to finance the construction of the motor hotel and the profit made thereon by the sellers should have been included in the proxy materials is also unpersuasive. The crucial issue in this transaction was the fairness of the price and the validity of the reasons for the acquisition and not the propriety of corporate actions taken previously and unrelated to the transaction. The market price depends on fair market value as of the date of the purchase and is not related to the sellers' basis. In essence, the plaintiff is seeking to indirectly challenge the corporation's previous decisions to execute leases which permitted the Marriott family to finance the construction of the motor hotel, rather than acquire the land and finance their own construction. Such objections are, in the opinion of the Court, not properly presented in the context of this litigation, nor sufficiently relevant to the shareholder's assessment of the advisability of the acquisition as of October 1965. The proxy statement adequately delineated the facts which were pertinent to the decision before the shareholders.

Throughout his briefs and his counsel's affidavits, the plaintiff has raised other alleged material defects. The Court has reviewed these allegations and concludes that they are either without factual merit or not material, and that further discussion of the Court's reasoning is unnecessary.

For the reasons stated above, the plaintiff has failed to establish a cause of action under either Sections 10(b) or 14(a) of the 1934 Securities and Exchange Act. Thus, the defendants are entitled to judgment.

Submit order.