Henry D. MAYER, Plaintiff,

v.

**DEVELOPMENT CORPORATION OF AMERICA, Defendant.**

Henry D. MAYER et al.,
Plaintiffs,

v.

**DEVELOPMENT CORPORATION OF AMERICA, Defendant.**

Henry D. MAYER, Plaintiff,

v.

**DEVELOPMENT CORPORATION OF AMERICA et al., Defendants.**

Civ. A. Nos. 74–73, 74–98 and 74–106.

United States District Court,
D. Delaware.

March 21, 1975.

Court three actions alleging breach of various contracts existing between themselves and the corporation as well as concomitant violations by the corporation and its directors of Section 14 of the Securities Exchange Act of 1934 and the rules promulgated thereunder. 15 U.S.C. § 78n, 17 C.F.R. § 240.14a-9. Defendants have filed certain preliminary motions directed at each of plaintiffs' actions; at the Court's request, these motions were consolidated for purposes of briefing, oral argument, and disposition here.

The interrelation of the three actions and the facts which gave rise to them are somewhat complex and merit a comprehensive recitation.

From 1958 through September 1969, Henry D. Mayer (Mayer) and his wife were the principal shareholders of three corporations (the Mayer Family Corporations) which were engaged in the acquisition and residential development of real estate in Ocean County, New Jersey. The Development Corporation of America (DCA) is a Delaware corporation principally engaged in residential construction and community development in Florida; its shares are traded on the American Stock Exchange.

Pursuant to an acquisition agreement dated September 5, 1969 (Plan of Acquisition), the Mayer Family Corporations were combined to form the Mayer Corporation, the assets of which were subsequently transferred to DCA. As partial consideration, the shareholders of the Mayer Family Corporations received 85,000 shares of DCA stock; an equal number of shares were placed in escrow to be released to the former shareholders of the Mayer Family Corporations if the Mayer Corporation earned a certain level of profits over a 3-year period following the acquisition. The agreement further provided that any time between October 6, 1972, and October 6, 1974, any shareholders who owned more than 50 percent of the shares issued pursuant to the agreement should have the right to request the registration with the Securi-

Frank O'Donnell, O'Donnell & Hughes, P. A., Wilmington, Del., Edward C. German, LaBrum & Doak, Philadelphia, Pa., for plaintiffs.

Henry N. Herndon, Jr., Charles M. Oberly, III, and Morris L. Stoltz, II, Morris, James, Hitchens & Williams, Wilmington, Del., Richard B. Dannenberg, Lipper, Lowey & Dannenberg, New York City, for defendants.

## OPINION AND ORDER

MURRAY M. SCHWARTZ, District Judge.

### I. FACTUAL BACKGROUND

Plaintiffs, both shareholders and one of whom was a former director of the defendant corporation, have filed in this

ties and Exchange Commission (SEC) of up to 50 percent of the shares due to the respective shareholders; DCA would then duly file a registration statement and use its best efforts to secure approval thereof.

Two ancillary agreements were executed pursuant to the Plan of Acquisition. The first, between Mayer and the newly-formed Mayer Corporation, specified that Mayer would remain in the employ of the Mayer Corporation as its President and chief operating officer for a period of 4 years, supervising its day-to-day operations and discharging such other duties as the Board of Directors might direct. In return, Mayer was to receive a specified annual salary together with fringe benefits enjoyed by other principal executive employees of the Mayer Corporation. The effectiveness of this employment agreement was expressly conditioned upon the consummation of Plan of Acquisition.

In the second ancillary agreement, three DCA directors, Sherman, Fishman, and Lempka, agreed to vote their shares at all meetings held for the election of members of the DCA Board of Directors in such a way as to assure the election of at least one member nominated by Mayer. In return, Mayer agreed to vote his shares of DCA for the election of such nominees as Alvin Sherman might designate.

In April 1973, pursuant to the Plan of Acquisition, the DCA shares placed in escrow pending the Mayer Corporation's achievement of certain profit levels during its first 3 years of operation were released to Mayer and his wife. These shares, as well as the balance of the shares Mayer had initially received from DCA, had not been registered with the SEC.

On or about February 4, 1974, Mayer and his wife allegedly requested that DCA register their shares of DCA stock pursuant to the Plan of Acquisition. On March 8, 1974, DCA advised plaintiffs that it would not register plaintiffs' DCA shares and has allegedly continued to refuse to register the shares since that time.

On March 28, 1974, the DCA Board of Directors held a special meeting at which it voted to terminate the employment of Mayer. Additionally, the Board suspended Mayer as a DCA director and voted to reduce the number of directors from nine to eight. Finally, the Board voted to hold the annual stockholders meeting on June 12, 1974.

On or about April 30, 1974, DCA mailed to its shareholders a notice of the June 12 meeting and a proxy statement. The latter document solicited proxies for the election of a slate of eight nominees for positions on the Board of Directors. These nominees were expressly designated as those of management; they included every individual who had served on the previous DCA Board, minus Mayer. The proxy statement recited, *inter alia*, the fact that there existed a voting agreement between Mayer and three other DCA directors as well as the fact that Mayer had been suspended and was not a nominee for a seat on the Board of Directors. The proxy statement did not reveal, in express terms, that Messrs. Sherman, Fishman, and Lempka would not vote the proxies in accordance with the voting agreement, *viz.*, to insure the re-election to the Board of Mayer or his nominee.

As a result of the foregoing transactions, four suits were filed. On April 11, 1974, Mayer instituted in this Court Civil Action No. 74–73 (CA–73), seeking damages for DCA's allegedly improper termination of his employment. Approximately one month later, on May 23, Mayer and his wife filed a second suit, Civil Action No. 74–98 (CA–98), seeking specific performance and damages for breach of the stock registration provisions of the Plan of Acquisition. Jurisdiction in both CA–73 and CA–98 is predicated upon diversity of citizenship.

On May 30, a third suit was filed by DCA and the Mayer Corporation in the Southern District of Florida. The Florida complaint includes one count of fraud

alleging that Mayer concealed from DCA in connection with its acquisition of the Mayer Corporation certain material facts relating to the latter's financial prospects, all in violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b–5 thereunder. Additionally, five common law counts alleging fraud, disloyalty, appropriation of corporate opportunities, and breach of contract were filed. It is the stated intention of DCA and the Mayer Corporation to interpose these counts as affirmative defenses and compulsory counterclaims in the Delaware actions. Defendants' Brief at 24.

The fourth and final suit, Civil Action No. 74–106 (CA–106), was filed in this Court on May 31, 1974; Messrs. Sherman, Lempka, and Fishman (as well as DCA) were named as defendants. In the first two counts, Mayer, both individually and derivatively, sought to enjoin the election of the DCA Board of Directors on grounds that the DCA proxy material contained misleading statements and material omissions in violation of Section 14 of the Exchange Act, 15 U.S.C. § 78n, and Rule 14a–9. Specifically, it was alleged that the proxy statement failed to accurately disclose whether the Board intended to honor the voting agreement between it and Mayer as well as the fact that the Board had been reduced from nine members to eight. In a third count, plaintiffs requested a decree of specific performance of the voting agreement and an award of punitive damages based upon the Court's pendent jurisdiction. On June 5, 1974, this Court denied plaintiff's Motion for a Temporary Restraining Order without prejudice to its right to have the election set aside if plaintiff should subsequently prevail on the merits. On July 22, 1974, plaintiff amended the complaint in CA–106, naming the entire Board of Directors of DCA as defendants. It was agreed that defendants' motions directed to the original complaint in CA–106 should apply as well to the amended complaint.

Five principal questions are raised by defendants' preliminary motions: (1) the existence of jurisdiction in CA–73 given the absence of an allegedly indispensable party whose presence would destroy diversity; (2) the existence of a federal cause of action in CA–106 pursuant to Section 14 of the 1934 Exchange Act and Rule 14a–9 thereunder; (3) the propriety of venue as to the individual defendants in CA–106; (4) the ability of Henry Mayer to maintain CA–106 as a derivative action; and (5) the desirability of transfer of all three actions now pending in this Court to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1404(a).

## II. THE MAYER CORPORATION AS AN INDISPENSABLE PARTY IN CA–73

In CA–73, plaintiff Mayer seeks damages for DCA's alleged breach of the employment contract entered into pursuant to DCA's acquisition of the Mayer Corporation. The complaint discloses that the contract of employment was originally executed by and between Mayer and the Mayer Corporation, both New Jersey residents. DCA was not a signatory, although by the contractual terms, it was rather clearly a third-party beneficiary.[1] According to the complaint, DCA subsequently assumed the obligations of the employment contract and, after January

---

1. The contract provides, in pertinent part:
   (6) During the term of his employment MAYER shall render faithful services to COMPANY [the Mayer Corporation] and, with his consent, to D.C.A., its subsidiaries and affiliates, shall devote all of his working time and efforts to his duties hereunder and shall hold no other employment and shall carry on no other business activity unless he first secures D.C.A.'s written consent. He shall so conduct himself at all times in the performance of his duties as will reflect upon COMPANY'S and D.C.A.'s names and reputations in their field of business.

1, 1974, paid plaintiff's salary directly. On or about March 28, 1974, it is alleged that DCA, without cause, discharged plaintiff and has since refused to pay any of the compensation or benefits called for by the contract.

█ It is the contention of defendant DCA that the Mayer Corporation is an indispensable party to CA–73 under Fed. R.Civ.P. 19. However, because the Mayer Corporation is incorporated and has its principal place of business in New Jersey, its joinder as a defendant would destroy complete diversity and thereby deprive this Court of subject matter jurisdiction. Accordingly, the status of the Mayer Corporation vis-a-vis Rule 19 must be assessed before any other issue raised by CA–73 may be considered.[2]

█ Rule 19(a)[3] requires the court to determine first what class of persons is required for a just adjudication of the controversy. An individual falls within this class if complete relief cannot be afforded existing parties in his absence, or if he claims an interest relating to the action and is so situated that his absence may impair his ability to protect that interest or subject existing parties to recurrent or otherwise inconsistent obligations. If an individual meets the criteria of Rule 19(a), he qualifies as a "necessary" party and must be joined if he is subject to service of process and his joinder will not destroy subject matter jurisdiction. If joinder is not feasible for either of these jurisdictional reasons, recourse must be had to the factors enumerated in Rule 19(b).[4] The ultimate question is whether "equity and good conscience" permit the action to proceed, but in deciding this, the court is required to determine whether judgment in a person's absence would prejudice him or those already parties, what protective provisions in a decree might lessen or avoid this prejudice, whether a judgment rendered in the person's absence will be adequate, and whether the plaintiff will have a satisfactory remedy if dismissed. C. Wright, Federal Courts § 70, at 300 (2d ed. 1970).

Defendant principally contends that the Mayer Corporation's joinder should be compelled because, in its absence, DCA will be unable to raise certain defenses and counterclaims which are available to the Mayer Corporation. Assuming that this contention is correct, defendant does not specify why this fact brings the Mayer Corporation within the

---

2. This is not to say that the failure to join an indispensable party constitutes a jurisdictional defect. Rather, the absence of a party who is determined to be indispensable compels, in itself, dismissal. *See* C. Wright, Federal Courts § 71, at 302 (2d ed. 1970).

3. (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

4. (b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

ambit of Rule 19(a). However, the Court need not determine the applicability of Rule 19 to such a circumstance here.

Defendant's argument assumes that the right to raise defenses or counterclaims is contingent upon the joinder of an absent person. In the instant case, this assumption is not borne out. The critical language in evaluating plaintiff's theory of recovery, hence, the counterclaims and defenses which will be available to defendant, is found in paragraph 5 of the complaint. Therein, plaintiff avers that

> [o]n or about December 1, 1973, by agreement between plaintiff and defendant, the obligations of the Mayer Construction Company as employer of Mayer were assumed by DCA.

Based upon this language, the alleged agreement of December 1st is consistent with at least two conclusions concerning the legal relationship which arose thereby. At first blush, it would appear the agreement was incident to an assignment of some or all of the contractual duties of the Mayer Corporation to DCA. Under this postulate, plaintiff Mayer could recover from DCA only as a third-party beneficiary of a contract of assignment between the Mayer Corporation and DCA.[5] The defenses which DCA might raise to such an action would be wholly independent of those which might be raised by the Mayer Corporation, whether the latter were joined as a party defendant or not. As Professor Corbin recognized:

> The defenses as against the third party in suits by him against the promisee and against the promisor are

different because he is suing two different persons on different causes of action. The defenses available to the promisor when he is sued on his promise by the promisee and by the third party, while more commonly available in both suits because both are to enforce the same promise, are frequently different for the reason that the two plaintiffs are separate persons, each having separate powers to affect his own legal right.

4 Corbin, *supra* § 818, at 276; *see also* §§ 821–22, at 281–85. Thus, assuming plaintiff Mayer is seeking to maintain CA–73 as a third-party beneficiary of a contract of assignment, the non-joinder of the Mayer Corporation will in no way affect either the defenses or counterclaims[6] which DCA might otherwise assert therein.

The alternative interpretation of the quoted paragraph of plaintiff's complaint does not compel a different conclusion. Under this hypothesis, the December 1st agreement constituted not an assignment of the employment contract, but a novation, plaintiff expressly or impliedly agreeing to accept DCA's performance of the contractual duties in lieu of that of the Mayer Corporation. Given this theory, plaintiff's action here would be directly predicated upon the new contract between himself and DCA arising by virtue of the novation. Plaintiff Mayer would owe his duties under the new contract either directly to DCA, or to the Mayer Corporation as a third-party beneficiary of the novation. In either event, his failure to discharge those duties would directly afford DCA a defense to the contract, notwithstand-

---

5. If the assignee contracts with his assignor to discharge the duties of the assignor to the third party, the latter is a creditor beneficiary of that contract. . . . [I]f the assignee fails to perform his contract with the assignor, the third party can maintain suit against the assignee, as a creditor beneficiary of the assignee's contract. 4 A. Corbin, A Comprehensive Treatise on the Rules of Contract Law § 906, at 627–28 (1951). *See also* Restatement (Second) of Contracts §§ 140, 150 & Comment (d) (Tent.Drafts 1–7, 1973); S. Williston, Treatise on the Law of Contracts § 418, at 98 (Jaeger ed. 1960).

6. If a third-party beneficiary of the original employment contract, DCA may counterclaim against Mayer, in addition to its ability to assert the defenses in question. *See* 4 Corbin, *supra* § 810, at 230–35.

ing the claims or defenses which would also be available to the absentee Mayer Corporation. Thus, again, the nonjoinder of the Mayer Corporation in CA–73 will not in any way diminish the defenses or counterclaims [7] which DCA might otherwise assert.

In attempting to evaluate the possible prejudice which might be suffered by DCA if the Mayer Corporation remains unjoined, the Court recognizes that the factual record as well as plaintiff's theories of recovery are less well-developed than might be desired. In assessing the alternative possibilities, certain factual and legal assumptions have been made without the benefit of briefing or a complete record. For this reason, the Court emphasizes that its analysis of the contractual rights and liabilities of the parties is advanced solely for the limited purpose of determining the joinder issue raised by defendant's motion.

Absent a more complete record and a fuller development by plaintiff and defendant of their precise legal theories, however, the Court is not now prepared to conclude that the Mayer Corporation's joinder should be compelled. Accordingly, defendant's motion will be denied, with leave to renew if and when the factual record and legal issues bearing upon the matter presented are more fully developed.

## III. THE SUFFICIENCY OF THE RULE 14a–9 CLAIM IN CA–106

Plaintiff Mayer seeks to recover in Counts I and II of CA–106 for allegedly material misstatements and omissions in the DCA proxy material mailed prior to the 1974 annual shareholders' meeting, all in violation of Section 14(a) of the 1934 Exchange Act, 15 U.S.C. § 78n(a),[8] and Rule 14a–9 [9] thereunder. Although plaintiff enumerates a large number of specific omissions, in essence they may be reduced to the following: (1) a failure to state whether the DCA proxy holders intended to honor their voting agreements with Henry Mayer, thereby assuring the election of Mayer or a Mayer designee at the annual shareholders' meeting; and (2) a failure to indicate that the Board of Directors had been reduced from nine to eight. Defendants here seek to have the first two counts of CA–106 dismissed for failure to state a cause of action [10] and concomitant dismissal of the third nonfederal count for want of pendent jurisdiction.[11]

The nature of the allegations requires a somewhat detailed explanation of the proxy statement. A seven-page printed

---

7. Again, if a third-party beneficiary of the original employment contract, DCA has a direct counterclaim against plaintiff Mayer if indeed Mayer committed acts constituting a breach of his employment obligations.

8. (a) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

9. No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the

light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting of subject matter which has become false or misleading.

10. Although the parties have filed a large number of affidavits in connection with various motions now before the Court, none have been directed to this particular motion to dismiss. Accordingly, the instant motion will not be treated as if it were a motion for summary judgment. *See* Braden v. University of Pittsburgh, 477 F.2d 1, 6 (3d Cir. 1973); Scott v. University of Delaware, 385 F.Supp. 937 (D.Del., filed Nov. 20, 1974).

11. Count III effectively seeks specific performance of the voting agreement.

document, the proxy statement provided in its opening paragraph, "[T]he enclosed Proxy is solicited by the management of Development Corporation of America. . . ." The statement apprised shareholders that the proxies were to be voted at the Annual Meeting of Stockholders to be held on June 12, 1974, and that shares represented by the proxies would be voted for the election to the Board of Directors of a slate of eight nominees. Shareholders were informed each nominee currently served as a director of DCA.

On page two of the statement, the voting agreement between Mayer and Sherman, Lempka, and Fishman was set forth:

Voting Agreement

In April, 1970, Messrs. Alvin Sherman, Edward Lempka, Irving Fishman and Henry Mayer entered an agreement which provided that until the earlier of December 31, 1980, or the death of Mr. Mayer, so long as Mr. Mayer continues to own at least 50% of the shares of the Company issued to him in connection with the acquisition of the Mayer Corporation, (i) Messrs. Sherman, Lempka and Fishman will vote their shares of the Company to elect a person designated by Mr. Mayer as a director, and (ii) Mr. Mayer will vote his shares for the election as directors of the Company such other persons as may be designated by Mr. Sherman. As of April 17, 1974, the foregoing individuals and members

of their immediate families, as a group, owned 24.8% of the Company's outstanding Common Stock.[12]

The description of the voting agreement was identical to that contained in prior proxy statements. At no point was it stated that Messrs. Sherman, Lempka, and Fishman did not intend to comply with its terms.

On the fourth page of the proxy statement, the shareholders were informed that an employment agreement had existed between Mayer and the Mayer Corporation. The statement advised, however, that Mayer's employment had been terminated on March 12, 1974, and that Mayer had commenced litigation pursuant to the dismissal. The paragraph concluded, "Mr. Mayer continues to be a Director of the Company although *he is under suspension and is not a nominee.*" (Emphasis added)

When read as a whole, one must conclude the proxy solicitation fairly apprised the DCA shareholders that there had been a disagreement with Mayer culminating in termination of his employment and litigation. Moreover, the previously-quoted portion of the proxy statement unequivocally informed shareholders that Henry Mayer was not eligible for reelection to the DCA Board. However, the voting agreement and description thereof provided that Messrs. Sherman, Lempka, and Fishman were obliged to vote their shares to elect a person *designated* by Mayer as a director. By virtue of this language, shareholders could reasonably believe

12. The so-called voting agreement is contained in a July 21, 1969 letter addressed to Henry D. Mayer and signed by three of the individual defendants and accepted by Mayer. It provides:

Dear Henry:
This will confirm, that upon the execution of the Agreement and Plan of Reorganization between Mayer Construction Co. and Development Corporation of America, you and we, have agreed to vote the shares of DCA respectively held by us, in the following manner:
1) So long as you shall hold at least 50% of the shares of DCA, received by you

under the Agreement, we shall vote our shares, at all meetings held for the election of members of the Board of Directors of DCA, so as to insure that the Board of Directors will always contain one member nominated by you.

2) You shall vote all shares of DCA, held by you, at all meetings held for the election of members of the Board of Directors of DCA, in favor of all other directors as Alvin Sherman shall advise you.

Very truly yours,

that one of the eight nominees for director was a designee of Mayer. This result obtains notwithstanding subsequent language in the proxy statement which specified that Mayer himself was "not a nominee." Nothing was stated about a designee of Mayer.

In order to conclude a Mayer designee was not among the eight nominees, it would have been necessary to inform solicited shareholders that Messrs. Sherman, Lempka and Fishman would not vote their shares to elect a Mayer designee. They were not so informed. In fact, the same language contained in the voting agreement paragraph of the proxy statement in question had been employed in prior proxy statements. While the language remained the same from one annual proxy statement to another, the facts had shifted dramatically insofar as they related to a Mayer designee. In prior years the directors did vote their shares for a Mayer designee; at the 1974 Annual Shareholders' Meeting, they had no such intention.

█ It thus appears from the amended complaint that the proxy solicitation material issued prior to the Annual Shareholders' Meeting did contain an omission or misrepresentation. This alone, however, is not enough. To be actionable under Rule 14a–9, an alleged misstatement or omission must be "material." In Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed. 2d 593 (1970), the Supreme Court observed:

> Where the misstatement or omission in a proxy statement has been shown to be "material," . . . that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have

been considered important by a reasonable shareholder who was in the process of deciding how to vote. This requirement that the defect have a significant *propensity* to affect the voting process is found in the express terms of Rule 14a–9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a).[13]

*Id.* at 384, 90 S.Ct. at 621. *See also* Affiliated Ute Citizens of Utah v. U. S., 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Puma v. Marriott, 363 F.Supp. 750, 757 (D.Del.1973); Gould v. American-Hawaiian S. S. Co., 331 F.Supp. 981, 986 (D.Del.1971). The objective standard "might have been considered important to a reasonable shareholder" found in the first sentence of the above-quoted language is arguably less stringent than the standard "the defect have a significant *propensity* to affect the voting process" found in the second sentence of the same language

In Rochez Bros., Inc. v. Rhoades, 491 F.2d 402, 408 (3d Cir. 1974), the Third Circuit in a Rule 10b–5 [14] case stated:

> The test of materiality of undisclosed or misrepresented facts is basically an objective one—i. e., whether a "reasonable man would attach importance [to them] in determining his choice of action in the transaction in question." List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

In citing the *List* test, the Third Circuit seemingly expressed approval of a higher standard of materiality than that ex-

13. Whether the Supreme Court intended in the quoted language to define the term "materiality" has been a matter of some dispute. In Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1301–02 (2d Cir. 1973), Chief Judge Friendly persuasively argued that it did not.

14. This district has noted similarities in treatment of Rule 10b–5 and Rule 14a–9. Puma v. Marriott, 363 F.Supp. 750, 757 & n. 10 (D.Del.1973).

pressed in the first sentence of the quoted language from *Mills*. *See* Gerstle v. Gamble-Skogmo, Inc., 478 F.2d at 1301–02. The rule as expressed in the Third Circuit has, in effect, substituted "would" for "might" in the first sentence of the *Mills* definition, ostensibly moving the objective standard from the mere "possibility" envisioned in the first sentence of *Mills* to the probability set forth in the second. *Id.* Further, it closely approaches and is perhaps equivalent to the standard set forth in the Second Circuit:

> [T]he test [is] whether "taking a properly realistic view, there is a *substantial* likelihood that the misstatement or omission may have led a stockholder to grant a proxy to the solicitor or to withhold one from the other side whereas in the absence of this he would have taken a contrary course."

*Id.* (emphasis in original); *accord* Smallwood v. Pearl Brewing Co., 489 F.2d 579 (5th Cir.), cert. denied, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).

For the foregoing reasons, it is concluded that an omission or misrepresentation is material under *Mills* only if there is a substantial likelihood that it may have been considered important by a reasonable shareholder in determining his course of action in the transaction in question.

Under the stated standard and principles, dismissal of the instant action is warranted only if it clearly appears that plaintiff will be unable to prove any set of facts which would entitle him to relief. Grossman, Faber & Miller, P. A. v. Cable Funding Corp., C.A. 4720 (D. Del. filed Dec. 16, 1974), *citing* Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L. Ed.2d 80 (1957). At this juncture, the Court is not prepared to conclude that plaintiff will be unable to adduce such facts.

Although the director's seat which is the subject of the instant controversy was but one of eight seats on the DCA Board, it appears from the comlaint as well as the briefs that this seat was an important one. The Mayer Corporation was a principal and possible highly significant subsidiary of DCA. It had developed under the aegis of Henry Mayer and undoubtedly owed much of its initial success to his efforts. The impact of the New Jersey operations on the economic well-being of DCA was possibly very substantial, and it was thus arguably important if not imperative that Henry Mayer or his representative have a voice in the business decisions made by the parent corporation affecting both the parent and the subsidiary. Under the circumstances, the Court cannot say that the presence of plaintiff Mayer's designee on the DCA Board would in all likelihood have been considered unimportant by a DCA shareholder, even if Henry Mayer himself were ineligible for a Board position.

The second omission which plaintiff claims was violative of Rule 14a–9 was the failure of DCA to expressly indicate that the number of seats on the DCA Board of Directors had been reduced by one.

Defendants correctly characterize this as an omission; however, the Court fails to perceive why it would have caused a DCA shareholder to refuse to vote for management's slate. The shareholders were not asked to approve the interim reduction in the number of seats; indeed, plaintiff does not allege or argue that the corporate charter or bylaws required it.[15] The shareholders were asked merely to vote for a slate of eight nominees proposed by management. The fact that they were asked to approve one less nominee than in previous elections does not, by itself, allow a conclusion of materiality.

The Court concludes: (1) that plaintiff has stated a cause of action with respect to defendants' failure to disclose the absence of a Mayer designee

---

15. *See* 9 Del.Code Ann. § 141(b) (Michie Supp.1975).

from the slate of directors proposed in the April 1974 proxy solicitation; and (2) that plaintiff has not stated a cause of action with respect to defendants' failure to specify the number of seats on the DCA Board. Accordingly, defendants' motion to dismiss CA–106 in its entirety must be denied.[16]

## IV. VENUE AS TO THE INDIVIDUAL DEFENDANTS IN CA–106

■ The eight individual defendants in CA–106 seek their dismissal from the instant litigation, asserting that venue does not lie in this district under the applicable provisions of the Exchange Act. Each of the eight currently serves as a director of DCA; three—Sherman, Lempka, and Fishman—were signatories to the stock voting agreement with Henry Mayer which forms the basis of much of the instant controversy.

Section 27 of the Exchange Act, 15 U.S.C. § 78aa, provides in pertinent part:

> Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter, or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business . . . .

The record reveals that the only connection between this forum and the defendants in CA–106 was the mailing of allegedly false and misleading proxy material to one DCA shareholder residing in this judicial district; moreover, it

appears that this shareholder was the record holder of only six shares of DCA during the period in question.[17] Because the individual defendants neither reside nor transact business in this district and are not otherwise to be found here, venue can be predicated, if at all, only upon the transmission of misleading proxy material to the single shareholder previously described.

Both plaintiff and defendants appear to agree that if the proxy material were indeed false or misleading, its transmission to even one Delaware shareholder would constitute a violation of the Exchange Act within this district.[18] Defendants argue, however, that the commission of an illegal act is not enough; rather, the act must be a *material* part of the allegedly illegal scheme if it is to support venue under Section 27. *See* Prettner v. Aston, 339 F.Supp. 273, 280 (D.Del.1972), *citing* Puma v. Marriott, 294 F.Supp. 1116, 1120 (D.Del.1969); Dauphin Corp. v. Redwall Corp., 201 F.Supp. 466 (D.Del.1962); Dauphin Corp. v. Davis, 201 F.Supp. 470 (D.Del.1962). In this connection, defendants place especial emphasis on Puma v. Marriott, wherein the view was expressed in dicta that the allegedly illegal solicitation of a small number of proxies in the forum jurisdiction, without more, might not constitute a sufficiently material act upon which to predicate venue. Applying the materiality standard articulated by the cases in this district as well as the dicta in *Puma,* defendants urge that the solicitation of but one shareholder's proxy, representing six out of 2.6 million voting shares, is not sufficient to give rise to venue in this judicial district.

The materiality test set forth in *Prettner, Puma* and other cases [19] was os-

---

16. Defendants do not seek dismissal of the third count stated in CA–106 for failure to state a legally-cognizable claim; accordingly, the Court expresses no opinion with respect to its sufficiency.

17. The total number of voting shares outstanding during the relevant period was 2,634,752.

18. "[T]he only available jurisdictional basis in this District as regards the individual defendants is that an 'act or transaction' constituting a violation of the Exchange Act occurred here." Defendants' Main Brief at 60.

19. *See also* Oxford First Corp. v. PNC Liquidating Corp., 372 F.Supp. 191 (E.D.Pa. 1974); Townsend Corp. of America v. Davidson, 222 F.Supp. 1 (S.D.N.J.1963).

tensibly first articulated by the Fifth Circuit in Hooper v. Mountain States Securities Corp., 282 F.2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S. Ct. 695, 5 L.Ed.2d 693 (1961). Therein, the court spoke to the problem of venue where the mails had been used to transmit nonfraudulent material which was nevertheless important to the consummation of a larger fraudulent scheme. In that context, the court implied, venue and jurisdiction would obtain "in every district where any use of such instrumentalities of the mail or interstate commerce was of material importance to the consummation of the scheme." *Id.* at 205.

The *Hooper* materiality test was subsequently adopted and further expanded by this Court in Dauphin Corp. v. Redwall Corp., 201 F.Supp. at 469–70. Therein, it was held that the filing and amendment in this district of the charters of two Delaware corporations were integral parts of the larger fraudulent scheme which formed the basis of the suit and were thus sufficient to support venue in this district. Significantly, the acts relied upon in *Dauphin* did not in themselves constitute violations of the Exchange Act. This fact was later emphasized in Jacobs v. Tenney, 316 F. Supp. 151, 158 (D.Del.1970) and Prettner v. Aston, 339 F.Supp. at 280. In both cases, the venue-conferring acts or transactions, though held to be material to the consummation of the allegedly fraudulent transaction, were not in themselves found to be violative of any provisions of federal securities legislation.

The genesis and subsequent application of the materiality doctrine under Section 27 thus appears to have been limited to instances in which the venue-conferring acts did not involve transmissions of fraudulent material into or out of the forum district or transactions which did not in themselves constitute

violations of federal securities statutes. Nowhere does it appear that the courts superimposed the materiality requirement where, as provided by Section 27, the venue-conferring act itself constituted a violation of the Exchange Act.

Defendants nevertheless urge that the materiality test be extended to acts or transactions which are consummate violations of federal securities laws. More specifically, defendants argue that where a violation involves a relatively miniscule number of shares and/or shareholders, such violation will not be sufficient to support venue in the jurisdiction in which the violation occurred.

The Court finds defendants' argument untenable, for three reasons. First, the holding in Puma v. Marriott need not be read in the manner urged by defendants. *See* Prettner v. Aston, 339 F.Supp. at 280. Second, in Section 27 of the Exchange Act, Congress specifically provided that venue should lie in the district wherein *"any* act or transaction constituting the violation occurred." (Emphasis added) Use of the term "any" belies the notion that the violation had to be material; under the express wording of Section 27, *any* violation—material or immaterial, great or small—would suffice.[20] Finally, the fact that violations of federal securities statutes have involved only miniscule numbers of shares or shareholders in relation to those affected by the entire scheme has not in other cases dissuaded the courts from upholding venue and jurisdiction under Section 27. In Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir. 1971), a single Utah shareholder complained of the transmission of one misleading press release into Utah and of other "acts incident to the sale of the stock" in question; notwithstanding the large number of shareholders and shares affected in other jurisdictions by the press release, the Tenth Circuit sustained

20. " 'Any' covers everything in a category or class. Its use excludes exceptions unless they are specifically given." United States v. Swift & Co., 158 F.Supp. 551, 555–56 (D.D.C.1958), *citing* United States v. National City Lines, Inc., 80 F.Supp. 734, 741–42 (S.D.Cal.1948) (construction of phrase "any civil action" in 28 U.S.C. § 1404(a)).

the venue and jurisdiction of the Utah court. And in Blau v. Lamb, 242 F.Supp. 151 (S.D.N.Y.1965), modified, 363 F.2d 507 (2d Cir. 1966), plaintiff sued under Section 16(b) to recover short-wing profits realized when defendants sought to dispose of a large number of shares acquired in a previous corporate reorganization. Although only a minute fraction of the shares in question had been disposed of in the forum district, the court rejected defendants' contention that these acts were an insufficient basis upon which to predicate venue. *Id.* 242 F.Supp. at 160.[21]

The materiality requirement announced in *Dauphin* and followed in *Puma* and *Prettner* need not have any applicability where, as here, the venue-conferring act in itself constitutes a violation of federal securities legislation.[22] If in fact the proxy solicitation materials transmitted into this jurisdiction were violative of any provision of the Exchange Act, notwithstanding the number of shareholders solicited or shares involved, such an act is a sufficient predicate for venue pursuant to the express terms of Section 27 as well as the cases decided thereunder.

Defendants' motion to dismiss for lack of venue is denied.

## V. PLAINTIFF MAYER'S ADEQUACY AS REPRESENTATIVE OF DCA SHAREHOLDERS IN CA–106

Rule 23.1 establishes the procedure to be followed in derivative actions by shareholders of corporations and members of unincorporated associations. The third sentence of that rule provides that a derivative action "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation . . .."

Defendants do not deny that a shareholder's derivative action may be a proper vehicle to redress alleged violations of Section 14 of the Exchange Act and the proxy rules thereunder. *See* J. I. Case, Inc. v. Borak, 377 U.S. 426, 431–32, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Dillon v. Berg, 326 F.Supp. 1214, 1218 (D.Del.1971). Defendants do, however, challenge plaintiff Mayer's ability to maintain CA–106 as a derivative action, asserting that he cannot fairly and adequately represent the interests of the DCA shareholders. This incapacity is predicated upon the fact (1) that Mayer seeks in other lawsuits[23] to recover substantial damages from DCA, and (2) that Mayer is himself a defendant in a suit alleging, among other things, substantial acts of disloyalty to DCA.

In the context of derivative as well as class actions, the requirement of fair and adequate representation is of crucial importance, for in both contexts, the rights and interests of absent persons may be conclusively determined. *See* Smith v. Alleghany Corp., 394 F.2d 381, 391 (2d Cir.), cert. denied, 393 U.S. 939, 89 S.Ct. 300, 21 L.Ed.2d 276 (1968); duPont v. Wyly, 61 F.R.D. 615

---

21. *Cf.* Coburn v. Warner, 110 F.Supp. 850 (S.D.N.Y.1953), wherein the mere mailing of a confirmation of sale from the forum district, which mailing itself constituted a violation of the Exchange Act, was held to confer venue under Section 27.

In Prettner v. Aston, the view was expressed that the allegedly unlawful solicitation of the votes of 14 shareholders and one brokerage house, holding a record total of 1,639 shares out of nearly 5 million, might be sufficient to establish venue in this district. 339 F.Supp. at 280. Qualitatively, there is little difference if any between the solicitation of 1,639 shares out of 5 million and 6 shares out of 2.6 million. In both cases, the number of shares solicited in relation to the number outstanding is clearly so insignificant as to be immaterial to the consummation of the larger fraudulent scheme.

22. This is not to say that the materiality requirement in cases involving violative as well as nonviolative acts is inapplicable. *See, e. g.,* Prettner v. Aston, 339 F.Supp. at 280. In such cases, the commission of either violative acts or material nonviolative acts may serve as predicate for venue under Section 27.

23. CA–73 and CA–98.

(D.Del.1973). In the class action context, the elements of fair representation are two:

> First, "the interests of the unnamed persons . . . [must be] closely identified with the interests of the representatives"—i. e., they must be members of the class sharing common issues and interests. . . . Second, the court must be assured that "the representatives [will] put up a real fight." Chafee, Some Problems of Equity 231 (1950).

duPont v. Wyly, 61 F.R.D. at 622, *citing* Dolgow v. Anderson, 43 F.R.D. 472, 493–94 (S.D.N.Y.1968). Given the identity of purpose behind the "fair and adequate" representation requirement in both class and derivative actions, the foregoing elements should be equally applicable to derivative actions as well as class suits. *See* 7A C. Wright & A. Miller, Federal Practice and Procedure § 1833, at 393 (1972).

▆▆▆ Judged by these criteria, the Court cannot state that Mayer fails to qualify as an adequate representative of the interests of DCA shareholders. To be sure, Mayer may be potentially liable to DCA for various breaches of common law and statutory duties, and he may himself recover substantial monetary damages from the corporation based upon the latter's alleged breach of its contractual duties. These contingencies should not, however, diminish Mayer's interest in seeking to redress an alleged violation of federal law which has resulted in his nonrepresentation on the DCA Board of Directors. Indeed, of all of the affected shareholders, it is Mayer who has the most direct interest in prosecuting and prevailing in an action of this type. It must therefore be concluded that Mayer has a sufficient stake in the outcome of this action to assure a vigorous and fair representation of the interests of all absentee shareholders.

The Court is not unmindful of the fact that a possible source of conflict may arise by virtue of the two collateral suits which Mayer is prosecuting against DCA in this Court. It is not unreasonable to assume that settlement negotiations between plaintiff and defendants may encompass all three actions and that an unfavorable compromise of the proxy action by Mayer might be the *quid pro quo* for a settlement of one or more of the remaining actions in his favor. However, this type of conflict presents itself anytime a shareholder institutes derivative as well as individual claims against a corporation; the Court is ill-disposed to foreclose the possibility of a derivative action whenever a plaintiff shareholder also has individual claims against a corporate defendant.[24] Moreover, Rule 23.1 specifically enjoins the court to scrutinize proposed settlements for the purpose of ascertaining whether an action has been improperly compromised. While this scrutiny cannot be a substitute for the fair and adequate representation otherwise required by the Rule,[25] it may serve to adequately protect against the specific conflict of interest of the type here presented.

For the foregoing reasons, it is concluded that plaintiff Mayer fairly and adequately represents the interests of similarly-situated shareholders in CA–106. Defendants' motion to dismiss the derivative count in that action is denied.

## VI. DEFENDANTS' MOTION TO TRANSFER TO THE SOUTHERN DISTRICT OF FLORIDA

Defendants have moved in CA–73, CA–98 and CA–106 to transfer each action to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1404(a). The latter provides that a civil action may be transferred to another district where it "might have been brought" if such a transfer appears to be "for the con-

---

24. *See* Traylor v. Marine Corp., 328 F.Supp. 382, 384 (E.D.Wis.1971).

25. duPont v. Wyly, 61 F.R.D. at 624.

venience of [the] parties and witnesses [and] in the interest of justice."

■ The burden of demonstrating that these standards are satisfied falls upon the party seeking transfer. The burden, however, is a heavy one, and a plaintiff's choice of forum will not be set aside unless the balance of convenience is *"strongly* in favor of [the] defendant." Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970) cert. denied, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971) (emphasis in original).[26]

### A. Consolidation of An Action in One Forum

■ As previously noted, the transactions which are the subject of the instant litigation have given rise to four separate lawsuits in the federal courts— three in this district and one in the Southern District of Florida.[27] The action in Florida by DCA and the Mayer Corporation is based essentially on the same course of conduct which will form the basis for the defenses and counterclaims which the Mayer Corporation and DCA will interpose in the Delaware actions. There is substantial identity in the questions of fact and law raised in all of the cases.

In such circumstances, the paramount concern—which goes to the convenience of all parties and witnesses as well as prudent judicial administration—should be the feasibility of transferring all four actions to a district where they may be tried together. *See* discussion in Jacobs v. Tenney, 316 F.Supp. 151, 169 (D.Del. 1970). Necessarily, this imports a consideration of the power of any given district to secure jurisdiction over all parties and thereby render a binding judgment with respect to all issues.

Defendants' principal contention is simply stated: since the Southern District of Florida is the only district in which all pending actions may be tried, judicial economy and the interests of justice require transfer of the Delaware actions to the Florida forum. Defendants collaterally assert that this Court cannot try all pending actions because (1) the Mayer Corporation is an indispensable party whose joinder will deprive this Court of jurisdiction in CA–73; (2) venue does not obtain with respect to the individual defendants in CA–106; and (3) the action now pending in the Southern District of Florida cannot be transferred to this forum because it could not have been filed here originally. *See* Hoffman v. Blaski, 363 U.S. 335, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960).

The first two contentions have been previously determined, and the third contention is without merit. Defendants

---

26. Defendants urge that this burden of proof is substantially diminished where, as here, either the plaintiff is not a resident of the forum jurisdiction or none of the acts giving rise to the causes of action occurred in the forum. *See* United Consolidated Industries, Inc. v. General Motors Corp., 343 F.Supp. 476 (E.D.Pa.1972); Quandt v. Beech Aircraft Corp., 317 F.Supp. 1009, 1012 (D.Del. 1970); Ross v. Tioga General Hospital, 293 F.Supp. 209 (S.D.N.Y.1968).

In each of the cited cases, however, the plaintiffs' residence or principal place of business as well as the place of the act or omission giving rise to the cause of action were somewhat distant from the forum jurisdiction. This is not the case in the instant action. Plaintiff Mayer and his wife are both residents of a neighboring jurisdiction; many of the acts and transactions which form the basis for the pending lawsuits occurred there—within 95 miles of this courthouse. Obviously, this was the forum closest to the plaintiffs' home in which they could effect personal service over the principal defendant, DCA; as such, it was the "most convenient and natural forum available." Schindelheim v. Braniff Airways, Inc., 202 F. Supp. 313 (S.D.N.Y.1962).

Under the circumstances, the heavy burden of proof continues on the party seeking transfer if plaintiff resides *in or near* the forum jurisdiction. Biedrzycki v. Aloca S. S. Co., 191 F.Supp. 893, 897 (E.D.Pa.1961). *See generally* 1 ALR Fed. 15, 66 & n.18.

27. A fifth suit, now pending in the New Jersey state courts, is not relevant to the instant transfer motion.

argue that the Florida action could not have been filed in Delaware—hence, is not transferrable here under Section 1404(a)—because the Mayers were not at relevant times amenable to service of process in this district. Whether the Florida action would be transferrable to this forum pursuant to Section 1404(a) is, however, irrelevant. Defendants concede that the claims which constitute the subject matter of the Florida actions are properly compulsory counterclaims to the litigation pending in this forum. Defendants' Brief at 24. Notwithstanding the transferability of the Florida action under Section 1404, defendants are free to refile as compulsory counterclaims here the claims now pending in Florida. As to such claims, the Mayer plaintiffs necessarily waive all objections to venue and process. *See* General Electric Co. v. Marvel Rare Metals Co., 287 U.S. 430, 53 S.Ct. 202, 77 L.Ed. 408 (1932). *See generally* 6 C. Wright & A. Miller, Federal Practice and Procedure § 1416, at 89 (1971). It is concluded this Court is competent to try all cases now pending here as well as in Florida.

Were this Court the only competent forum, our inquiry into the advisability of transfer might here end. However, it appears that the Florida district court is also competent to adjudicate all pending controversies. The actions currently pending in the Florida district court consist of one count alleging violations of the Exchange Act and a number of pendent common law counts. Plaintiffs do not disagree that the actions now in Delaware might be transferred to Florida under Section 1404(a). They assert, however, that the Florida court is powerless to adjudicate the pendent common law counts in the Florida action, pointing to the fact that personal jurisdiction in Florida may be effected only with respect to the count alleging violations of the Exchange Act. The nationwide service of process provisions of that Act do not allow, at least in the Southern District of Florida, extraterritorial service with respect to pendent nonfederal counts. *See* Ratner v. Scientific Resources Corp., 53 F.R.D. 325 (S.D.Fla. 1971), app. dismissed, 462 F.2d 616 (5th Cir. 1972). *Contra*, Puma v. Marriott, 294 F.Supp. 1116, 1121 (D.Del.1969).

In the event defendants' transfer motion were granted, however, this problem might be readily circumvented. DCA's common law claims could conceivably be filed as compulsory counterclaims to the transferred suits. The Mayers, pursuant to the transfer, might then become amenable to service of process on these counterclaims notwithstanding the prohibitions of *Ratner*. *See* Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc., 286 F.Supp. 62, 65 (N.D.Ill.1968).

It must be concluded that this Court as well as the Florida federal court are equally competent to entertain all pending federal actions between the Mayers, DCA, and the DCA directors. Accordingly, attention must be focused on the relative convenience to the parties and potential witnesses of a transfer of the Delaware actions to the Southern District of Florida.

### B. The Convenience of Parties and Witnesses

All plaintiffs herein are residents of New Jersey. Plaintiff Henry Mayer is presently Chairman of the Board of Citizens State Bank of New Jersey. Defendant DCA is incorporated in Delaware and has its principal place of business in Hollywood, Florida. Seven individual defendants in CA–106 reside in Florida; one resides in New Jersey.

Plaintiffs and defendants have both named anticipated witnesses residing in Florida and New Jersey. In plaintiffs' case, over 100 witnesses, most of whom now reside in New Jersey, have been listed. These include various attorneys, real estate agents, engineers, state officials, accountants, bank officers, and Mayer Corporation employees, among others (Mayer Aff., Ex. VII). Defendants' list of anticipated witnesses is more modest; it consists primarily of the principal officers and directors of DCA

together with several subordinate DCA and Mayer Corporation employees. With one exception, these witnesses are all residents of Florida.

In terms of sheer numbers, the list of New Jersey witnesses proposed by plaintiff and the concomitant inconvenience of a Florida trial clearly preponderate. However, in evaluating inconvenience, it is the quality of the proposed testimony—not the quantity of conceivable witnesses which the parties can suggest—which is determinative. Aamco Automatic Transmissions, Inc. v. Hagenbarth, 296 F.Supp. 1142, 1143–44 (E.D. Pa.1968); United Air Lines Inc. v. United States, 192 F.Supp. 795 (D.Del. 1959).

Defendants urge that few of the plaintiffs' anticipated witnesses have any knowledge of the relevant facts, particularly with respect to the alleged fraud perpetrated by Mayer. They further suggest that the testimony of many is of a cumulative nature, or is such that it may be presented by way of deposition. Finally, defendants argue that the evidentiary crux of the instant litigation consists of a large quantity of documents prepared in Florida, sent to Florida, or found in the internal files of the Mayer Corporation. They suggest that it is these documents—not the testimony of the anticipated New Jersey witnesses—upon which the claims and counterclaims in the pending lawsuits will stand or fall.

The Court disagrees. Even a cursory examination of defendants' Florida complaint indicates that the testimony of many New Jersey witnesses will be of relevance to the suits here and in Florida. Among other things, the Florida complaint charges Mayer with fraudulent concealment of the Mayer Corporation's declining growth prospects, the decreasing availability of land upon which the Mayer Corporation could build, a reasonably probable decline in productivity and gross profit margins, and the personal real estate dealings in New Jersey by both Mayer and his wife. The complaint goes on to allege the appropriation by Mayer of corporate assets and opportunities located in New Jersey as well as acts of disloyalty by Mayer, including the devotion of disproportionate amounts of time to the affairs of a New Jersey bank, all to the neglect of day-to-day duties owed the Mayer Corporation. These alleged acts occurred primarily, if not solely, in New Jersey. They will form the foundation of a number of counterclaims and defenses which defendants will assert in the Delaware litigation. Indubitably, the testimony of many witnesses now residing in New Jersey—some or many of whom are within the subpoena power of this Court [28]—will be relevant to the successful assertion of these counterclaims and defenses. Based on the record as it now exists, we cannot say that the anticipated testimony of the witnesses listed by Mayer is cumulative, irrelevant, or otherwise superfluous.

For similar reasons, defendants' assertion that documentary evidence will be of overriding importance must be discounted. The allegedly fraudulent representations made by Mayer to DCA may well be contained in documents which DCA will produce at trial. Yet the fraudulent character of these documents must be measured against the facts they purport to represent. Dealing as they do with the Mayer Corporation, these facts occurred wholly or primarily in

28. The subpoena power of a court over potential witnesses is an important factor in the grant or denial of a transfer motion. See Schilling-Hillier S. A. Industrial E Comercial v. Virginia-Carolina Chemical Corp., 19 F.R.D. 271, 273 (S.D.N.Y.1956). Because most of defendants' witnesses in Florida are agents or employees of DCA, their presence at trial may be compelled by the defendant notwithstanding this Court's lack of subpoena power over them. It appears, however, that a large number of plaintiffs' witnesses are not their employees or agents and could not be compelled to appear as witnesses if these actions were tried in Florida (Mayer Aff., Ex. VII). In such circumstances, the availability of the Court's subpoena power is significant. Id.

New Jersey, and must be evaluated through the testimony of New Jersey witnesses.[29]

With respect to the inconvenience of the parties, it is undoubtedly true that the directors of DCA who might be required to testify in Delaware will be inconvenienced; it is also true that the corporate affairs of DCA may to some degree suffer neglect. However, there is no evidence that Henry Mayer, his wife, and the witnesses now residing in New Jersey will be substantially less inconvenienced or that their business affairs will suffer less neglect than those of DCA if the instant cases are transferred to Florida.

On balance, the foregoing facts do not demonstrate that considerations of convenience weigh "strongly in favor of defendant." *Shutte, supra* 431 F.2d at 25. There are, to be sure, parties and witnesses on both sides who will be substantially inconvenienced whether the litigation takes place in this forum or in the Southern District of Florida. At best, however, defendants have demonstrated only that this inconvenience will be shifted from one side to the other in the event their motion is granted. Under these circumstances, defendants' motion to transfer must be denied. Miracle Stretch Underwear Corp. v. Alba Hosiery Mills Inc., 136 F.Supp. 508 (D.Del. 1955).[30]

### ORDER

It is ordered, adjudged and decreed that:

1. Defendants' motion to dismiss CA–73 for failure to join an indispensable party is denied without prejudice to renew said motion under the terms and conditions stated in the Court's opinion;

2. Defendants' motion to dismiss Counts I and II of CA–106 for failure to state a claim upon which relief may be granted, for improper venue with respect to the individual defendants therein and for plaintiff Mayer's inadequacy as a proper shareholder representative, is denied; and

3. Defendants' alternative motion to transfer CA–73, CA–98 and CA–106 to the United States District Court for the Southern District of Florida is denied.

---

29. Even were it to be conceded that documentary evidence would be of overriding importance in the pending litigation, defendants have not shown conclusively where most of these documents are now located; defendants' brief itself indicates in at least two places that relevant documents are located in New Jersey as well as Florida. Defendants' Brief at 23, 49. Moreover, defendants have failed to show that relevant documents now located in Florida could not be conveniently introduced at trial in Delaware.

30. Plaintiffs have not requested a stay of the Florida action; accordingly, the Court will decline to enter one at this time.