Paul K. RITTER, Raymond M. Fravin, Jr., Eugene I. Swarts, Ben R. Soave, and Marvin A. Haupt, Individually and as Assignees of James Vander Galien, David Dalpian, and Ohio Valley Coals, Inc. (formerly Vendel Mineral Corporation), a Michigan Corporation, and Mason Mining Company, a Michigan limited partnership; and James Vander Galien and David Dalpian, and Douglas Sheffield, Plaintiffs,

v.

Edgar ZUSPAN, Marjorie Zuspan, William F. Zuspan, Velma Zuspan, Fairchild, Inc. (formerly Fairchild Equipment & Supply Co.), a West Virginia Corporation, Defendants.

Civ. No. 7–71255.

United States District Court, E. D. Michigan, S. D.

June 9, 1978.

Raymond A. Koltys, Birmingham, Mich., for plaintiffs.

Kathleen G. Lewis and Thomas M. Sullivan, Detroit, Mich., for defendants.

## MEMORANDUM OPINION

RALPH M. FREEMAN, District Judge.

This matter is before the Court on a motion to dismiss for lack of personal jurisdiction and improper venue, or in the alternative, to transfer to the Southern District of West Virginia on the basis of *forum non conveniens* under 28 U.S.C. § 1404(a). The case involves allegations of securities violations in connection with the sale of defendants' coal mine. The facts as alleged in the complaint, the answer, and the various motions and affidavits are that James Vander Galien, a general partner in Vandel Mineral Corporation, travelled to West Virginia and solicited from the defendants Zuspan the sale of a deep coal mine, mining leases and equipment located in Mason County, West Virginia. The negotiations leading up to the execution of the October 25, 1974 agreement (Basic Agreement), and the execution of that agreement all occurred in Point Pleasant, West Virginia.

Of the four Zuspans, three of them never had occasion to visit, call or write anyone in the State of Michigan regarding the coal mine transaction. The fourth Zuspan, Edgar, communicated with some of the plaintiffs by phone or letter for the purpose of arranging . accommodations, and agreeing on appointment times for meetings or other non-material facets of the transaction.

After purchasing the coal mine through Vandel Mineral Corporation, Vander Galien and his associate, Dalpian, returned to Michigan where they undertook their own program of soliciting persons to invest in a limited partnership they set up, which partnership was called Mason Mining Company. Vander Galien and Dalpian intended to use monies they obtained from investors in their limited partnership to pay for the purchase of the coal mine.

Vander Galien and Dalpian apparently obtained about $175,000 from seven limited partners. In consideration of becoming a general partner, Dalpian contributed $35,000 in cash, agreed to act as a general partner through Vandel Mineral Corporation and agreed to lease the mine equipment to the limited partnership. Vander Galien also became a general partner in consideration for his agreement to act as the general partner in Mason Mining Company.

In connection with persuading the limited partners to contribute money, Vander Galien and Dalpian flew a number of potential investors to Mason County, West Virginia to look at the coal mine. Of all the Zuspans, only Edgar Zuspan had any contact whatsoever with Vander Galien's and Dalpian's investors.

Vander Galien and Dalpian, consistent with the terms of their limited partnership scheme, personally undertook the management of the coal mine located in Mason County, West Virginia. The mine operation was not successful, and this suit followed.

In opposition to the motion to dismiss plaintiffs submitted an affidavit from Robert A. Hudson, plaintiffs' original counsel in this case, which states as follows:

1. That on or before October 25, 1974 the law firm of Hoops and Huff, of which he was an employee, was engaged to represent Vandel Mineral Corporation, a Michigan corporation, which was a General Partner in a limited partnership known as Mason Mining Company.

2. That subsequent thereto he negotiated on behalf of said client to purchase the stock and/or assets of Ohio Valley Coals, Inc., a West Virginia corporation.

3. That he negotiated the transaction with Cecil Dean, who represented Edgar Zuspan, Marjorie Zuspan, William P. Zuspan and Velma Zuspan.

4. That two Agreements were negotiated and subsequently executed by all parties.

5. A basic agreement was dated on or about October 25, 1974.

6. Subsequently a supplemental agreement was received through the mails at said office on May 13, 1975, together with a letter dated May 12, 1975 from Cecil Dean, Esq. Said agreement was subsequently dated May 21, 1975.

7. That on July 7, 1975, affiant received through the mails a copy of a Promissory Note, Deed of Trust, Minutes and a copy of an executed supplemental agreement, together with letter dated July 2, 1975 from Cecil Dean, Esq. Nothing in the affidavit suggests that the Supplemental Agreement was executed in Michigan despite some ambiguous language in the cover letters which accompanied the documents described in Hudson's affidavit. In contrast, defendants aver that all negotiations and execution of the agreements were accomplished in West Virginia.

The securities laws have special jurisdiction and venue provisions, which provide that any suit may be brought in the district (1) wherein the defendant is found; or (2) is an inhabitant; or (3) transacts business; or (4) wherein any act or transaction constituting the violation occurred. 15 U.S.C. §§ 77v(a); 78aa. Since it is clear that the first three provisions are inapplicable to this case, the only issue is whether any act or transaction constituting the alleged violation occurred in this district. That specific provision of the venue statute has been explained as follows:

> In order for venue to be proper in a district wherein any act or transaction constituting an alleged violation occurred, only one act in the forum district, which represents more than an immaterial part of the allegedly illegal events, is required; and an omission may be an "act" within the statute. The test is whether the act on which venue is predicated is an integral part of, or of material importance to, commission of the acts alleged to be in violation of the Act, and the act within the forum district need not form the core of the claim or itself constitute a violation of the Act in order to establish venue.

> In particular circumstances, the act or transaction sufficient for venue purposes may consist of the transmission of a press release to an investor; or the purchase and sale of shares on the floors of stock exchanges; or any use of instrumentalities of the mails or other interstate facilities made within the forum district constituting an important step in the execution of the fraudulent, deceitful scheme in the purchase or sale of stock or in its consummation; or a variety of other acts or transactions. 79 C.J.S. Supp. Securities Regulation § 134 pp. 372–73

Without question, the intent of the venue and jurisdiction provisions of the securities laws is to grant potential plaintiffs liberal choice in their selection of a forum. An examination of recent cases, however, reveals some limitation even on the wide latitude conferred by the statute. In *Oxford First Corp. v. PNC Liquidating Corp.*, 372 F.Supp. 191 (E.D.Pa.1974), the Court declined to dismiss a case where defendants had given allegedly misleading financial statements to one party who had in turn used those statements in negotiating a transaction with plaintiffs, whose stock defendants had received in exchange for their own. The court found that jurisdiction and venue were proper in the Eastern District of Pennsylvania because defendants had caused information which formed the basis of the alleged violation to be transmitted into that district. The court discussed the activities of the defendants in the context of the "materiality" standard which has evolved in securities venue cases, stating:

> The St. Claire defendants argue that even if they knew that their financial statements would be sent to and relied upon by Oxford First in Philadelphia, such knowledge will not sustain venue (and hence, on plaintiffs' theory, in per-

sonam jurisdiction under § 27), since it is not an "act within the forum district representing more than an immaterial part of the allegedly illegal event." *Prettner v. Aston,* 339 F.Supp. 273, 280 (D.Del. 1972). But the "allegedly illegal event" in the instant case includes alleged material misrepresentations by the St. Claire defendants that the plaintiffs' claim injured them, and the St. Claire defendants' knowledge that such misrepresentations would be seen and used by Oxford First in Philadelphia is more than an immaterial part of such alleged fraud on the plaintiffs. Even if the St. Claire defendants did not control or intend to benefit by Old Paragon's deal with Oxford First, their (alleged) act of knowingly letting their false representations be sent to and relied on by Oxford First in Philadelphia was not an immaterial part of the "allegedly illegal event" which culminated in Philadelphia. Although the facts here are not as strong as those in *Stern v. Gobeloff* [332 F.Supp. 909 (D.Md. 1971)] and *Texas Gulf Sulphur,* [*Texas Gulf Sulphur Co. v. Ritter,* 371 F.2d 145 (10th Cir. 1967)], supra, on which plaintiffs rely, we believe that they are sufficient for us to conclude at this stage that the St. Claire defendants caused financial information (claimed to be false or misleading) to be sent into this judicial district, and that venue properly lies in this Court.

■ Another recent case, *Mayer v. Development Corporation of America,* 396 F.Supp. 917 (D.Del.1975) explained at some length the materiality standard referred to in *Oxford First:* Unless the venue-conferring act *itself* constitutes a violation of the Exchange Act, the act must form a material part of the allegedly fraudulent transaction in order to confer venue. The court explained:

> The materiality test set forth in *Prettner, Puma* [*Puma v. Mariott,* 294 F.Supp. 1116 (D.Del.1969)] and other cases was ostensibly first articulated by the Fifth Circuit in *Hooper v. Mountain States Securities Corp.,* 282 F.2d 195 (5th Cir., 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961). Therein, the court spoke to the problem of venue where the mails had been used to transmit nonfraudulent material which was nevertheless important to the consummation of a larger fraudulent scheme. In that context, the court implied, venue and jurisdiction would obtain "in every district where any use of such instrumentalities of the mail or interstate commerce was of material importance to the consummation of the scheme." *Id.* at 205.

The *Hooper* materiality test was subsequently adopted and further expanded by this Court in *Dauphin Corp. v. Redwall Corp.,* 201 F.Supp. [466] at 469–70. Therein, it was held that the filing and amendment in this district of the charters of two Delaware corporations were integral parts of the larger fraudulent scheme which formed on the basis of the suit and were thus sufficient to support venue in this district. Significantly, the acts relied upon in *Dauphin* did not in themselves constitute violations of the Exchange Act. This fact was later emphasized in *Jacobs v. Tenney,* 316 F.Supp. 151, 158 (D.Del.1970) and *Prettner v. Aston,* 339 F.Supp. at 280. In both cases, the venue-conferring acts or transactions, though held to be material to the consummation of the allegedly fraudulent transaction, were not in themselves found to be violative of any provisions of federal securities legislation.

The genesis and subsequent application of the materiality doctrine under Section 27 thus appears to have been limited to instances in which the venue-conferring acts did not involve transmissions of fraudulent material into or out of the forum district or transactions which did not in themselves constitute violations of federal securities statutes. Nowhere does it appear that the courts superimposed the materiality requirement where, as provided by Section 27, the venue-conferring act itself constituted a violation of the Exchange Act.

Examination of other recent cases, i. e., *Warren v. Bokum Resources Corp.,* 433 F.Supp. 1360 (D.N.M.1977); and *Mitchell v. Texas Gulf Sulphur Co.,* 446 F.2d 90 (10th

Cir. 1971) reveals holdings entirely consistent with *Oxford First* and *Mayer.* Venue and jurisdiction will obtain in every district where use of the mail is of material importance to the consummation of the allegedly fraudulent scheme, or where the venue-conferring act, even if immaterial, itself forms the basis for a securities law violation.

■ This Court cannot agree that any act has occurred in this district which satisfies the standard just set forth. Defendants never at any time solicited a purchaser for their mind; rather, plaintiffs sought them out in West Virginia. Plaintiffs travelled to West Virginia on their own initiative, and all representations made by defendants concerning the coal mine were made there. All negotiations were carried on in West Virginia, and all relevant documents were executed in that state.

This is not a typical securities fraud case in which a defendant has initiated a transaction by sending out a prospectus, a proxy statement, a tender offer or a press release. Here, the entire transaction was generated by the plaintiffs themselves. This Court cannot agree, in light of the particular facts of this case, that the sending of a few documents through the mails, seven months after the execution of the Basic Agreement, was an act of material importance to the consummation of the allegedly fraudulent scheme. Rather, the Court finds this act to be similar to the one discussed in *United Industrial Corp. v. Nuclear Corp. of America,* 237 F.Supp. 971 (D.Del.1964), wherein the court stated:

> Plaintiff next points out that § 2.1 of the Semcor contract, after reciting that 7,000,000 shares of Nuclear stock were authorized, stated that Nuclear intended to promptly increase its authorized capital stock to 10,000,000 shares, and that this was done by a certificate of amendment to the Nuclear charter which was filed on June 8, 1961, in Dover, Delaware. Since the certificate was executed by Thomas as president of Nuclear, plaintiff argues that it constituted action in Delaware which was an integral part of his alleged wrongful activities.

■ This argument is based upon a misconception of the significance of the amendment. The amendment did not take place until almost a month after the closing. Prior to the amendment, Nuclear had sufficient authorized but unissued stock to enable it to carry out the Semcor contract by issuing 536,280 shares of stock to plaintiff. The increase in the authorized capital stock was not related to any of the wrongs with which Thomas or the other defendants are charged. The filing of the certificate of amendment was not an "integral part of the fraud" or "of material importance to the sale," as was true in *Dauphin Corp. v. Redwall Corp.,* 201 F.Supp. 466, 469-470 (D.Del.1962) relied upon by plaintiff.

Similarly, this Court cannot find that the forwarding of a few documents to plaintiffs' attorney was of material importance where the transaction was in fact consummated seven months earlier.

In summary, this Court finds that plaintiff cannot meet the jurisdiction and venue provisions set out in 15 U.S.C. §§ 77v(a) and 78aa, and, accordingly, defendants' motions to dismiss will be granted and this case will be dismissed without prejudice.

An appropriate order shall be submitted.