Russell E. C. MARTIN, Plaintiff,

v.

James C. STEUBNER, Northland Development Company of Minneapolis, Inc. and Northland Community Arena, Respondents.

No. C–2–76–357.

United States District Court,
S. D. Ohio, E. D.

Oct. 30, 1979.

Robert C. Perrin, Columbus, Ohio, for plaintiff.

Alan L. Briggs, Fred A. Summer, Columbus, Ohio, Peter F. Greiner, Minneapolis, Minn., for defendants.

## OPINION AND ORDER

DUNCAN, District Judge.

### I. *Statement of the Case*

Plaintiff filed this action on May 13, 1976, asking for damages caused by alleged violations of federal and state securities laws. The case arises out of the purchase of an interest in a limited partnership formed for the purpose of developing an ice-skating arena in a suburb of Minneapolis, Minnesota.

The complaint states six separate grounds for relief. Paragraph One seeks relief under Ohio Revised Code (R.C.) 1707.43, which permits a purchaser of securities to rescind his contract and receive restitution of his purchase price plus court costs when the sale was made in violation of R.C. 1707.-01–.45.

Paragraph Two alleges a violation of § 12(2) of the Federal Securities Act of 1933, 15 U.S.C. § 77*l*(2), which prohibits misrepresentations made with the use of means of interstate commerce in connection with the offer or sale of securities.

Paragraph Three of the complaint alleges a violation of § 17(a) of the Federal Securities Act of 1933, 15 U.S.C. § 77q,(a), prohibiting misrepresentations made to a purchaser in connection with the offer or sale of securities.

Paragraph Four alleges a violation of § 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10b–5 promulgated thereunder, which prohibit material misrepresentations made in connection with the sale of securities.

Paragraph Five alleges common law fraud and deceit in the sale of the partnership interest.

Paragraph Six alleges a violation of R.C. 1707.41 which makes any person offering securities for sale or receiving profits from their sale liable to the purchaser for damages caused by written misrepresentations inducing the purchase.

### II. *Jurisdiction*

Defendants dispute the jurisdiction of this Court. Plaintiff asserts jurisdiction

under 15 U.S.C. §§ 77v and 78aa, diversity of citizenship and pendent jurisdiction.

■■■ In an earlier ruling this Court found that the admittedly slight contact defendants had with Ohio was sufficient to confer jurisdiction in this Court over the persons of the defendants. I see no reason to alter that finding. The question is actually one of venue. It has been noted that when suit is brought under both the 1933 and the 1934 Federal Securities Acts, venue may be determined according to the broader provisions of the 1934 Act. *Stern v. Gobeloff*, 332 F.Supp. 909 (D.Md.1971). Venue and jurisdiction obtain in every district where the use of the mail is of material importance to the consummation of the allegedly fraudulent scheme. *Ritter v. Zuspan*, 451 F.Supp. 926, 930 (E.D.Mich.1978).

The Court has jurisdiction over the persons of the defendants pursuant to the nationwide service provisions of 15 U.S.C. §§ 77v and 78aa, which authorize process to be served in any district where the defendant may be found.

■■■ As far as the state claims are concerned, since they are properly within the pendent jurisdiction of the federal court, *UMW v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), there is no merit to an objection that venue would be improper if the state claims were sued on alone, or that personal jurisdiction has been obtained only by virtue of the federal securities statutes allowing nationwide service on the federal claims. Wright & Miller, Federal Practice & Procedure § 1478; *Robinson v. Penn Central Co.*, 484 F.2d 553 (3d Cir. 1973); *U. S. Dental Institute v. American Assn. of Orthodontists*, 396 F.Supp. 565, 575 (N.D.Ill. 1975); *Puma v. Marriott*, 294 F.Supp. 1116, 1121 (D.Del.1969); *Kane v. Central American Mining & Oil, Inc.*, 235 F.Supp. 559, 568 (S.D.N.Y.1964). *See Hagans v. Levine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

The case was tried to the Court. Findings of fact and conclusions of law are set forth below as required by Fed.R.Civ.P. 52(a).

### III. *Facts*

1. Plaintiff is Russell E. C. Martin, 68, who has been retired from a position with the Federal Public Health Service since 1971. He is a high school graduate and has attended college level courses in a night program with a major in Business Administration. Upon his retirement, Martin invested in oil wells. He owns or owned "stripper" wells in Ohio and West Virginia. In 1974 he earned at least $30,000 from the sale of three wells. As of the time of trial, Martin resided in Bremen, Ohio, with his wife, who is a retired school teacher.

2. Defendant Northland Development Company of Minneapolis, Inc. (hereafter NDC), is a Minnesota corporation. Northland Community Arena (hereafter NCA) is a limited partnership formed under the laws of Minnesota. NDC is the general partner of NCA. Defendant James C. Steubner is the president of NDC and of NCA.

3. NCA was formed in 1973 for the purpose of owning and operating an ice skating arena in Brooklyn Park, a suburb of Minneapolis. The arena was completed and opened in the fall of 1973.

4. The arena was very popular. There was greater demand during certain prime periods than the facility could accommodate and defendants found themselves turning down business during those periods. As a result, in 1974 NCA concluded that in order to be financially successful it needed a second sheet of ice to accommodate the heavy demand in prime time hours.

5. In order to finance construction of an addition to house the second rink, NCA determined to seek additional limited partners to contribute up to $550,000. The funds not provided by new partners' contributions were intended to be borrowed from commercial banks or advanced by NDC.

6. In September 1974, Steubner advertised in the midwest edition of the *Wall Street Journal* for new partners to contribute to the financing of the planned expansion. The advertisement read as follows:

The heading, printed in large bold face capital letters, reads: "SUBSTANTIAL

1974 TAX SHELTER." In small type there follows:

Available to investor in expanding real estate project.

All or part of $500,000 limited partnership share available (minimum investment $100,000).

Closing must be made by Oct. 1, 1974. Qualified replies only please.

Below this language is set forth the name, address, and phone number of NDC in Minnesota.

7. Plaintiff was interested in locating a tax shelter to cover excess earnings in 1974. Upon reading the ad on or about September 5, 1974, Martin contacted defendants requesting more information.

8. In response, on September 10, 1974, Steubner wrote a letter describing the facility, its planned expansion and the financial aspects of the expansion. The letter, which was intended to be a brief description rather than a detailed explanation of the investment opportunity, was sent to plaintiff in Ohio. It stated, *inter alia* :

The Arena has had almost instant success starting with its opening in November of 1973 and our problem at the moment is that it does not have sufficient capacity to handle the approximately $175,000 to $200,000 in additional business during prime time rental hours.

The letter stated further:

Our new investor(s) who will be contributing $550,000 in equity capital will end up owning approximately 68% of the entire facility including the original Arena which was built with both debt and equity financing.

We offer tax sheltered income and a guaranteed 10% plus return (after taxes) until the building is refinanced.

9. Sometime in late September 1974, and after receiving the letter, Martin traveled to Minneapolis unannounced. He visited James Steubner and discussed the nature of the investment. During his visit, which lasted between 1¼ and 3 hours, Martin toured the arena with Steubner. Steubner showed Martin the financial statements for NCA, which apparently revealed the NCA's then-current financial posture, but did not show him the financial statements of NDC for 1973 and 1974 which showed a deficit shareholder's equity—$600,000 owed to NDC by NCA. He did, however, explain this debt to Martin in discussing the possibility that NDC would advance more in the event that partnership contributions were not raised in the amount of $550,000.

The parties differ somewhat regarding what information was exchanged orally during plaintiff's visit to Minnesota. It is clear that this conference is the source of much of the information which Martin obtained about the proposed project and which Steubner obtained about Martin. Precisely what was discussed, however, was the subject of conflicting testimony. In resolving credibility questions necessarily arising from these conflicts, the Court has largely adopted Mr. Steubner's version. At trial, Steubner answered questions sincerely and in a straightforward manner, and his testimony was thoroughly consistent with pretrial discovery such as admissions and answers to interrogatories submitted as evidence in the case. Mr. Martin, on the other hand, while striking the Court as at times sincere in answering questions from the stand, was often evasive and made numerous inconsistent statements. In addition, plaintiff testified that he had occasional losses of memory as a result of the physical illness hypoglycemia. He testified he was suffering from that symptom at the time of his deposition and at the time of trial. At trial, plaintiff responded thus to the following question:

Q. Are you having a memory loss, sir, with regard to your conversations with Mr. Steubner in Minneapolis?

A. I can't put it in that kind of language and get a true answer because there are degrees.

Accordingly, the Court finds the following transpired on plaintiff's visit to Minneapolis.

Plaintiff's unannounced arrival gave Mr. Steubner the subjective impression that plaintiff was a businessman wealthy

enough to risk traveling across country without knowing whether Steubner would be there. He was dressed in a gray suit and appeared to Steubner as a conservative businessman.

Steubner asked plaintiff about his business. Martin identified himself as being "in the oil business" as a wildcat oil driller and discussed difficulties he was having obtaining steel for drilling new wells. Martin told Steubner he needed somewhere between $25,000 and $38,000 for tax shelter because he had not been able to get pipe to drill new wells in order to shelter income from others. At no time did plaintiff indicate that he was retired. Defendant did not ask plaintiff what his income was but did inform plaintiff that he needed a net worth of three times the amount of his investment. Steubner did ask plaintiff whether he had invested in other limited partnerships, and plaintiff responded that he owned several farms in Minnesota. Steubner explained to plaintiff that he would get no interest and that his investment was in the equity fund in NCA.

Judging from the questions plaintiff asked about the financial statements, Steubner concluded it was "very obvious" that plaintiff understood what was on them, and that he understood the nature of partnership investment and tax shelter.

Finally, Steubner asked plaintiff whether the investment was one he could afford in the sense that a risk was involved. Martin indicated it was and stated that he was concerned that the projected $185,000 loss for 1974 could all be used on his return. Upon his departure, Martin indicated he was seriously interested but did not know how much he might invest.

Based on the statements made by Steubner and the documents provided for Martin's examination, the Court finds that the plaintiff was aware or reasonably should have been aware of the risky nature of the investment offered to him.

10. At the end of his visit with Steubner, plaintiff was favorably impressed but had not yet decided whether to invest. Plaintiff returned to Ohio, and on October 1, 1974, sold his oil wells for $32,000 ($40,000 less the depletion allowance) and telephoned Steubner with additional inquiry. Specifically, Martin wanted written confirmation that he could utilize the projected tax loss of $184,000 for the entire 1974 year even if he invested as late as October 1974.

11. On October 3, 1974, Steubner forwarded to Martin a letter from the accounting firm of Haskins & Sells confirming that plaintiff could take the tax loss on his 1974 tax returns.

12. On October 3, 1974, Steubner responded to Martin's phone call by letter, stating, in pertinent part:

In the event we do not reach the total $550,000 it is our intention to close the transaction and temporarily finance the balance of the construction through our bank lines. We would however complete the partnership units as soon as possible. However, judging by the number of parties interested and committed at this time we do not feel that the completion of the offering will be delayed or if it is it would be a small percentage.

13. At the time of the October 3, 1974, letter, although the NDC's bank lines were committed to make a loan, the NCA project had prompted a number of inquiries but no written or enforceable commitments from potential partners. Ultimately, only two new partners contributed: Mr. Martin and Mr. Ogle, making a joint contribution of $350,000.

14. On or about October 12, 1974, while in West Virginia, plaintiff called defendants' offices, informed them that he would invest $100,000 and inquired where the money was to be sent. Acting on instructions from Steubner, Martin wired the funds from his Ohio broker to defendants' bank in Minnesota.

15. On October 17, 1974, Steubner mailed to plaintiff in Ohio the subscription agreement, which stated in part:

I realize that this is a speculative venture and that earnings therefore may be uncertain, I acknowledge receipt of information pertinent to evaluation of this

investment, I am a "sophisticated investor" as defined by the Internal Revenue Service and the Federal Securities and Exchange Commission, and that I have a financial net worth at least three times greater than the amount of this investment.

This paragraph was contained in similar agreements which had been shown to, and read by plaintiff at the time of his visit to Minneapolis. Plaintiff read this, signed the subscription agreement, and mailed it back to Steubner in Minnesota on October 24, 1974.

16. Martin enclosed a letter to Steubner inquiring about "interest payments," saying in part:

The $100,000 which I had wired to your bank on the 14th of October, I hope commenced working in my behalf, immediately. If at all possible, please take the necessary steps to have interest payments mailed to me in the interim in case your accountant cannot compensate for subscriptions which are apparently arriving over a span of several weeks.

The letter was typed on business stationery with a letterhead of the "Oil Field Research and Development Company." Martin had crossed out the printed New York address with ink and had typed in his Bremen, Ohio, post office box address.

17. Distressed by Mr. Martin's reference to interest payments, Steubner wrote Martin on November 1, 1974:

I hope there was no misunderstanding that we would be paying interest as such on your partnership contribution. These are invested as equity funds in the Arena and you are in effect an equity owner through your partnership interest.

18. On December 15, 1974, plaintiff wrote Steubner, thanking Steubner for informing him about progress on construction of the arena and requesting a copy of the Limited Partnership Agreement and Certificate of Limited Partnership dated October 1974 because he did "not want the IRS to say [he] was making a last minute deal for tax purposes." Martin expressed no dissatisfaction with the transaction in this letter.

19. On January 5, 1975, Steubner sent the requested documents to the partners: Mr. Frye, Mr. Ogle and Mr. Martin.

20. Construction was begun in late 1974 on the arena and proceeded on schedule. In February, however, catastrophe struck. The rinks were cooled by liquid freon running through some 20 miles of steel tubing connecting both buildings. While hooking up the second arena to the system, water entered the pipes and contaminated the entire system. Both buildings were shut down for five to six weeks. The disruption this caused the community in rescheduling tournament games and other skating activities destroyed positive community relations for the arena.

21. Meanwhile, on March 3, 1975, Martin wrote Steubner, explaining that he needed only $35,000 worth of tax shelter from the arena and inquiring when the second arena was to be ready for use.

22. On March 14, 1975, Steubner sent Martin the IRS Form K–1 reporting his share of the NCA partnership for 1974 and wrote Martin explaining the mishap in construction and the plans to open the new rink the following week.

23. Thereafter, plaintiff did not express dissatisfaction with his contract but wrote numerous letters suggesting ways in which the arena might be saved. Among his recommendations were several sophisticated financing concepts such as bridge financing, industrial revenue bond financing, merger with another company (letter of August 12, 1975), and the names of several corporations to whom it might profitably be sold (letter of August 30, 1975).

24. Defendants conducted lengthy negotiations with municipal officials for the sale of the arena to the City of Brooklyn Park in the fall of 1975. The proposition was placed on the ballot but fell through when the voters, by referendum, refused to approve the sale.

25. In December 1975, plaintiff instructed his attorney, Mr. Jolin, to obtain his money back.

26. On April 23, 1976, plaintiff declared the transaction void, tendered a return of the partnership interest and demanded a return of his investment.

27. In the meantime, after studying a number of options, defendants have, with the investment of substantial personal effort and personal funds, transformed the properties into an operating enterprise. The two rinks now house general recreational and sports facilities for athletic activities such as swimming, tennis, racquetball and weightlifting.

28. Plaintiff has used the losses from the arena for tax shelter purposes every year since he made his original investment.

29. The partnership interest sold to Martin was never registered in Ohio.

30. No registration for NCA was filed with the Minnesota Division of Securities because it was exempt under Minnesota law as a private placement.

### IV. *Discussion of Law*

#### A. *Section 12(2) of the Federal Securities Act of 1933*

■ This section provides for the restitution of the security price paid plus interest in a suit against the seller for communicating an untrue statement or the omission of material facts necessary to avoid making the statements misleading. Plaintiff's case under this section is barred by the one-year statute of limitations set forth in § 13 of the 1933 Act, 15 U.S.C. § 77m. This action would have had to be brought within one year after the discovery of the alleged untrue statements or material omissions was or should have been made by the exercise of reasonable diligence.

While there was inconsistency between the plaintiff's trial and deposition testimony regarding when he felt "taken," I find that the following admissions made in his deposition testimony indicate plaintiff's state of mind regarding his reaction to the defendants' November 1, 1974, letter informing him that no interest payments would be made:

A. This was the first inkling I had.

Q. Now, after you read that sentence, you say you got an inkling of what?

A. That this was not an ethical and good business dealing operation.

Q. Now, did you have the feeling at that point in time you'd been taken?

A. I wasn't positive, but I had a feeling.

Q. You had a pretty strong feeling, but you weren't positive?

A. I couldn't say how strong, but I was hoping for the better at that time, and still trusting the man.

Q. You had a feeling you were in trouble, but you weren't sure at that point in time?

A. Yes.

Q. Now, after you had this feeling you were in trouble, what steps did you take at that point in time to determine whether or not you were in trouble? What did you do?

A. Nothing.

Q. Why?

A. I felt I had no choice. I felt I was taken. I was just trusting it would shape up all right, and my suspicions were wrong.

Deposition, 82–83. Upon receipt of this letter, plaintiff was aware that he misunderstood the nature of his investment. This knowledge should reasonably have prompted him to exercise due diligence to discover whether untrue statements or omissions had been made to induce his purchase. He failed to do so. Instead, he held onto his interest, made use of the tax shelter it provided him, and advised the defendants continually regarding the management of his partnership, until April 1976 when he tendered his subscription agreement and offered to rescind his purchase. For the purposes of the § 12(2) claim, at the latest, plaintiff should have filed suit within one year from receipt of the defendants' November 1, 1974, letter. His failure to file within that period bars this claim under 15 U.S.C. § 77m.

#### B. *Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934*

■ Count IV of plaintiff's complaint sets forth a claim of violation of Section

10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78(j) and Rule 10b-5 promulgated thereunder. That section makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, to make fraudulent representations or omissions in connection with the purchase or sale of securities. The law is well settled that a defendant cannot be liable under this section unless he has acted with scienter, that is he must have intended the wrongdoing; the statute does not apply to negligent conduct. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 212, 214, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

The letters of September 10, 1974 and October 3, 1974, constituted offers to sell a security. The plaintiff contends that those letters contained untrue statements of material fact, including

(a) that NCA had been an instant success;

(b) that NDC general partner, had made an equity investment of $81,000 in NCA;

(c) that there were commitments for all or substantially all of the additional $550,000 needed by NCA; and

(d) that defendants guaranteed a ten percent return after taxes.

The plaintiff further contends that those letters contain omissions of facts necessary to make the defendants' statements not misleading. These alleged omissions are as follows:

(e) that there were no binding commitments for substantially all of the $550,000 sought to be raised by NCA;

(f) that NDC, as general partner of NCA, had not made an equity investment of $81,000 in NCA;

(g) that NDC had a deficit net worth;

(h) that NCA had a deficit net worth;

(i) that NDC and NCA were not in a financial position to guarantee a ten percent plus return after taxes;

(j) that NCA had lost money;

(k) That Steubner had been an executive officer of other companies which had failed.

I find that the statement in the letter of September 10, 1974, that "the arena has had almost instant success" was an untrue statement. As is noted below, "success" was intended to refer to market rather than financial success. But a highly reasonable inference from this statement would be that the arena is a currently profitable venture, which was clearly not true.

The plaintiff next contends that the statement that the general partner, NDC, had made an equity investment of $81,000 in NCA is one of the untrue statements made in the letters of September 10, 1974 and October 3, 1974. Although there was in the record some dispute whether this statement was in fact untrue, I find that this statement cannot form the basis for a claim of misrepresentation because it was not communicated to Martin before he made his investment.[1] The statement referred to was made in a letter dated January 22, 1975, several months after Mr. Martin made his $100,000 investment. Accordingly, it is difficult to see how the statement whether true or false would have played a material role in inducing Mr. Martin to invest.

Next plaintiff contends that Steubner made the untrue statements that there were commitments for all or substantially all of the additional $550,000 needed by NCA. The simple fact is that neither letter contained such a statement. In the September 10 letter, it is clear that as of the time of the writing no money had been invested in the new project. At the time of the October 3 letter, it is also clear that Steubner did not have the investment that he wanted. That is revealed by the language "in the event that we do not reach the total $550,000 . . . ."

Next plaintiff complains that the defendants stated that they would guarantee a ten

---

1. It is true that Martin did see and discuss the "Investment Plan" before his purchase during his visit to Minneapolis. That document lists as among the original equity investors the general partner to the extent of $81,000. But this information is not a "statement" of contribution; rather it is a tentative projection to which defendants may not reasonably be held.

percent return after taxes. The language referred to appears in Steubner's letter of September 10:

We offer tax sheltered income and a guaranteed ten percent plus return after taxes) until the building is refinanced.

As Mr. Steubner explained at trial, the guaranteed ten percent meant that by virtue of the tax shelter a limited partner would save at least ten percent of his investment if he is above the 50% tax bracket. Thus an investment of $100,000 would yield at least a $10,000 tax savings. This is by no means clear from the language in the letter. On the other hand, there is no other more reasonable inference from the language of the letter. It does not speak in terms of interest; it does not mention dividends. I do not find this statement to have been untrue when made. Moreover, Mr. Steubner's testimony that he explained what was meant by this statement to Mr. Martin during his visit is to be credited as clearing up any confusion that phrase created.

Plaintiff next complains of misstatements or omissions of relevant facts necessary to avoid misleading a potential investor. First plaintiff claims that it is not clear from the letter of October 3, 1974, that there were no binding commitments for substantially all of the $550,000 sought to be raised for the second arena. The language of that letter does imply that there were "a number of interested and committed parties." The failure to amplify this statement is the sort of omission which is likely to mislead a potential investor. Similarly, the failure to inform Mr. Martin of fact (g) above regarding the deficit net worth of NDC is also the kind of omission upon which liability may be founded. The same is not true, however, of (f), for the reasons above-stated; of (h), because the financial statements of NCA which the parties discussed on plaintiff's visit clearly reveal the deficit net worth of the arena partnership;[2] of (i), because it has not been established that such a statement is, in fact, true; or (j) since I believe

it is clear from the information plaintiff did have available to him that NCA had lost or was losing money—that is, that without the second rink, it could not be a profitable venture, clearly, the sizeable tax shelter offer implied a *presently* unprofitable undertaking.

Finally, information contained in (k), regarding Mr. Steubner's past business history is of the sort upon which a reasonable investor might rely in making his decision to invest.

Accordingly, I hold that the statement that the arena was an instant success was a misstatement of fact; the failure to provide information that there were, at the time of the October 3 letter no binding partnership commitments, that the general partner NDC had a deficit net worth, and that Mr. Steubner's business history included stewardship in another company which had failed, were omissions to state material facts within the meaning of Rule 10b–5.

Notwithstanding that conclusion, I do not find defendants' misstatement or omissions to have been made with the scienter required by § 10(b) and Rule 10b–5.

The defendants' original ad in the *Wall Street Journal* indicated plainly that the investment sought was for tax shelter purposes. Plaintiff sought tax shelter and got it. Steubner's attempt in his letter of September 10 to apprise plaintiff generally of the nature of the investment was largely adequate. Steubner testified that "success" as used in that letter was meant to be understood to refer to the high popularity and demand for the arena—market success—rather than the financial success of the arena. This is consistent with the last half of that sentence, which states "and our problem at the moment is that it does not have sufficient capacity to handle the approximately $175,000 to $200,000 in additional business during prime time rental hours."

---

2. Steubner showed the financial statements of NCA to Martin on his visit and discussed them. The "Statement of Operations and Deficit for the Month ended August 30, 1974" shows a net

loss of $119,761 for the arena for the year to date. That figure is shown as $138,314 on the September 30, 1974, statement.

Given the circumstances surrounding Mr. Martin's visit to Minneapolis, Mr. Steubner's omission to discuss or put in writing all conceivably material information is understandable. In the usual securities fraud case, it is the seller, or insider, who misleads the buyer, or outsider. In this case, however, it appears that·Martin misled Steubner into believing that he was a sophisticated investor, thoroughly familiar with the workings of limited partnerships and speculative ventures. By arriving unannounced to look over the arena, Martin inadvertently made the impression of one wealthy and powerful enough to travel halfway across the country without regard to making appointments. He did much to further this image by identifying himself as "in the oil business," as owning several farms and by indicating that his income equalled the necessary three times his investment.

Steubner did not show Martin financial statements of NDC which indicated that that corporation had a deficit net worth in 1973 and 1974. Financial statements for those years indicate that liabilities exceeded assets of $2,276,668 by $1,052 in 1973 and assets of $3,644,941 by $3,980 in 1974. On the other hand, Steubner did explain the role of NDC and did inform Martin of the $679,007 that NDC had advanced to NCA, of which $575,000 was a mortgage loan and the remainder was a direct loan from the general partner NDC. Based on this, I cannot find any intent to defraud or misrepresent on Steubner's part with respect to NDC. From all the evidence adduced at trial and after observing the demeanor of the parties as witnesses, I believe that Steubner honestly believed that Martin was a wealthy, sophisticated investor who knew the meaning of the investment Steubner offered to him and that Steubner made the offer, described the transaction and the potential of the project with no intent to defraud.

In addition, there was no evidence that the NCA project was in fact a fraudulent scheme or dangerously risky or that it would not have been profitable barring the accident which occurred during construction. There is simply no evidence that the defendants entered into this transaction with any fraudulent intent. Accordingly, I hold the defendants are not liable for violation of 15 U.S.C. § 78(j) and Rule 10b–5.

## C. *Other Fraud Allegations*

For the same reasons, I find no liability exists under § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), R.C. 1707.41, nor under common law fraud and deceit principles. *Sanders v. John Nuveen & Co.*, 554 F.2d 790 (7th Cir. 1977); *SEC v. Coffey*, 493 F.2d 1304, 1314 (6th Cir. 1974); *Kellman v. ICS, Inc.*, 447 F.2d 1305 (6th Cir. 1971); *Greenwalt v. Goodyear Tire & Rubber Co.*, 164 Ohio St. 1, 128 N.E.2d 116 (S.Ct. 1955).

## D. *Ohio's Blue Sky Law*

██ As noted above, ¶ 1 of plaintiff's complaint alleges a violation of R.C. 1707.-43. That section provides in pertinent part as follows:

> Every sale or contract for sale made in violation of §§ 1707.01 to 1707.45, inclusive, [the Chapter entitled "Securities"] of the Revised Code, is voidable at the election of the purchaser. The person making such sale or contract for sale, and every person who has participated in or aided the seller in any way in making such sale or contract for sale, are jointly and severally liable to such purchaser, in an action at law in any court of competent jurisdiction, upon tender to the seller in person or in open court of the securities sold or of the contract made, for the full amount paid by such purchaser and for all taxable court costs, unless the court determines that the violation did not materially affect the protection contemplated by the violated provision.

As I read the statute, it imposes liability without fault if the following elements are proved: there must be a "sale"; of a "security"; in violation of any of the noted provisions of the securities chapter, which violation materially affects the protection contemplated by the violated provision.

Plaintiff's theory of recovery under R.C. 1707.43 is that there was a sale of a security

in Ohio by the defendants to the plaintiff consisting of a limited partnership interest in NCA, that the sale was made in violation of R.C. 1707.09 which provides that all "securities . . . shall, before being sold in this state, be qualified in the manner provided by this section"; and finally that these violations materially affected protection contemplated by the violated provisions because registration of securities under the Act is essential to initiate the procedures set forth in it to protect the public. *Miller v. Griffith*, 28 Ohio Op. 278, 98 Ohio L.Abs. 488, 196 N.E.2d 154 (Ct.App. Columbiana Co. 1961). Plaintiff points out that defendants have the burden of proof to establish that the violations did not materially affect the protection contemplated, *Biernbaum v. Midwest Oil & Gas Co.*, 108 Ohio App. 560, 160 N.E.2d 410 (1959), and failed to present evidence on this question.

Defendants do not contest plaintiff's legal conclusion that the $100,000 is a "security" within the definition of R.C. 1707.01(B) as "any certificate or instrument which represents title to or interest in . . . the capital, assets, profits, property or credit of any person . . . ." Nor do they contest that the sale of the partnership interest was a "sale" as defined by R.C. 1707.01(c)(1) and (2). The definition of "sale" embodied in these subsections is quite broad, including the full meaning of sale as applied by or accepted in courts of law or equity, every disposition or attempt to dispose of a security or of an interest in a security, a contract to sell, an exchange, an attempt to sell, a solicitation of a sale, a solicitation of an offer to buy, a subscription or an offer to sell, and any act by which a sale is made.

■ However, defendants do contest the applicability of the Ohio Blue Sky Law to them. They argue that the sale of this security was not a violation of that act because they were under no duty to register this transaction in Ohio. The gist of defendants' argument is that this transaction failed to fall within the outer parameters of the territorial reach of Ohio's securities law.

The law concerning the applicability of a state Blue Sky Law or interstate transactions and foreign defendants is far from clear. *See* Loss & Cowell, *Blue Sky Law*, 181–229 (1959). The cases which do consider the question defy generalization and tend to raise more questions than they answer. *Compare Aldens, Inc. v. LaFollette*, 552 F.2d 745 (7th Cir. 1977); *Gaillard v. Field*, 381 F.2d 25, 28–29 (10th Cir. 1967), cert. denied, 389 U.S. 1044, 88 S.Ct. 787, 19 L.Ed.2d 836; *Doherty v. Bartlett*, 81 F.2d 920 (1st Cir. 1936); *and Lane v. Griswold*, 273 N.C. 1, 9–12, 159 S.E.2d 338, 344–46 (1968) *with Rousseff v. Dean Witter & Co.*, 453 F.Supp. 774 (N.D.Ind.1978); *Marketlines, Inc. v. Chamberlain*, 63 Ill.App.2d 274, 211 N.E.2d 399 (1965); *and People v. Fairfax Family Fund, Inc.*, 235 Cal.App.2d 881, 47 Cal.Rptr. 812 (1964).

This inquiry is distinct from the issues discussed above with regard to the Court's jurisdiction. As an inquiry into the territorial reach of a state's *legislative* power, it is also different from the question of the territorial reach of a state's *judicial* power. Like the question of state judicial jurisdiction, however, the scope of state regulatory legislation is limited by due process considerations of fundamental fairness.

The section which plaintiff claims has been violated by the defendants, R.C. 1707.-09, clearly requires that securities subject to registration by qualification are those that will be "sold in this state." The relevant question, then, becomes whether, within the contemplation of this statute, the "sale" of the partnership interest occurred "in this state." The parties have offered and the Court finds no Ohio case construing this phrase. This phrase is typical in Blue Sky legislation, and is implied in statutes which do not contain it. Loss & Cowett, *Blue Sky Law, supra* at 211. Turning to discussions of other courts in other jurisdictions for guidance, I find that the question whether a statute applies as a simple matter of statutory construction invariably becomes inextricably bound up with the question whether it may apply as a matter of constitutional due process.

That the phrase does not mean literally what it says is illustrated by the interpreta-

tion given it in a 1935 opinion of the Ohio Attorney General. A strict application of the statutory language would make an advertisement in an out-of-state publication— as "solicitation of a sale, a solicitation of an offer to buy, or an offer to sell"—a "sale in this state" when read by persons in Ohio. Yet the Ohio Attorney General stated:

> The offering and sale of securities by a resident of one state to a resident of another state through the mail by means of advertisement in periodicals published in a state other than that of the purchaser constitutes interstate commerce. It has been repeatedly held by the Supreme Court of the United States that in the exercise of their police power the states are not precluded from indirectly burdening interstate commerce, subject to certain limitations. This point was involved in the case of *Hall v. Geiger Jones*, 242 U.S. 539, the court recognizing that the Ohio Securities Act there under consideration only regulated the sale of certain securities within this state, which securities might have been acquired by the seller within the state in interstate commerce previous to such offering and sale in Ohio.
>
> . . . . .
>
> It is my opinion that advertisements offering securities by non-resident and non-licensed dealers, which securities are not registered under the Ohio Securities Act, are not prohibited by such act when such advertisements are contained in newspapers, magazines or periodicals published outside of the state and offered for sale on newsstands within this state or sent to subscribers by mail. 1935 Ohio A. G. Opinions 1423, 1424–26.

The meaning of the term "sale in this state," thus is not construed to be as broad as a plain reading of the statute may indicate. A careful reading of the opinion reveals that the limits the Ohio Attorney General placed on the statute's reach were constitutional, rather than statutory. *Id.* at 1424. Given the broad definition of "sale" in the statute, its permissible breadth is limited by United States constitutional due process considerations.

In *Traveler's Health Association v. Virginia*, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950), the Supreme Court, without analyzing the application of the statute by its terms, held that application of a Virginia Blue Sky provision, making it unlawful for any person to offer for sale any securities in the state without registering them, to a Nebraska mail order health insurance business which it had been stipulated had never entered the state of Virginia, did not offend due process. The court distinguished its decision in *Minnesota Association v. Benn*, 261 U.S. 140, 43 S.Ct. 293, 67 L.Ed. 573 (1923), an early judicial jurisdiction case in which the court had found the circumstances insufficient to support personal jurisdiction on a "doing business" theory:

> But where business activities reach out beyond one state and create continuing relationships and obligations with citizens of another state, courts need not resort to a fictional "consent" in order to sustain the jurisdiction of regulatory agencies in the latter state.

*Traveler's Health, supra*, 339 U.S. at 647, 70 S.Ct. at 929. Taking the interest of the state in seeing the insurance obligations faithfully observed together with the contacts and ties of the appellants with Virginia residents in that case, the Court held that the state was justified in subjecting the defendants to cease and desist proceedings under the Virginia Blue Sky Law. *Id.* at 648, 70 S.Ct. 927. That decision does not conclusively resolve the question in this case, however, since the Supreme Court's decision stands for the proposition that it is not unconstitutional to apply the Blue Sky Law of a state to a sale effected in that state to a person who is not within its boundaries either physically or through agents when there is some continuity to the selling effort. L. Loss, 1 Securities Regulation 80 (1961). The opinion expressly states that in that case the Nebraska "association did not engage in mere isolated or short-lived transactions." Thus as Professor Loss points out, "the *Traveler's Health* case on its facts is not a square holding that the law

of the state of the buyer's residence could be constitutionally applied to a single isolated transaction . . . ."

The case does indicate, however, that the question of the scope of legislative power on out-of-state parties will necessarily be a question to be resolved anew in each case upon the examination of the particular statutory provision in question and the particular contacts and ties that a transaction has with the regulating state.

In the instant case defendants' contact with Ohio is minimal. Defendants have no place of business in this state; they never entered the state nor have they conducted any business here; defendants did not solicit telephonically in Ohio; and any contact with this state through the use of the mails was in response to inquiries put by the plaintiff. Defendants do have some nexus with the state of Ohio by virtue of: (1) their advertisement in the midwest *Wall Street Journal*, published in Chicago, with circulation in Ohio; (2) their mailing, in response to plaintiff's inquiries, the letter of September 10, 1974, to Ohio; (3) their mailing, likewise in response to plaintiff's request, the October 3, 1974, letter regarding plaintiff's tax loss, to Ohio; and finally (4) their mailing of the unsigned subscription agreement to Ohio on October 17, 1974, where it was signed and returned to Minnesota by the plaintiff.

I have some difficulty justifying the application of the Ohio Blue Sky Law to the defendants in this case, based on the minimal contacts listed.

First, the Ohio Attorney General's Opinion above-cited indicates that the Attorney General of Ohio would not consider the Ohio Blue Sky Law applicable to the advertisement of non-registered securities in the midwest *Wall Street Journal*.

Assuming that this remains the law of Ohio, the question remains whether the mailing of two letters and the subscription agreement to Ohio for plaintiff's signature constitute a "sale in this state." These contacts are, admittedly, slight. As the only nexus of a single, isolated transaction with Ohio, these acts may not be sufficient,

by themselves, to justify the extension of Ohio's regulatory legislation to defendants. But viewed together with the State's interest in protecting its citizens from the sale of securities which have not been first subjected to the State's investigative and evaluative processes, such an extension does not appear unfair or to offend due process concepts.

Because the statute bans any sale in violation of the securities chapter, without regard to fault, a conclusion that the particular transaction at issue was neither fraudulent nor unnecessarily speculative would not affect the applicability of the statute. *Crane v. Courtright*, 2 Ohio App.2d 125, 206 N.E.2d 913 (Franklin Co. 1964). Nor does such an argument diminish the importance of the state's interest in protecting its citizens from their own "stupidity, gullibility, and avariciousness." *Bronaugh v. R. & E. Dredging Co.*, 16 Ohio St.2d 35, 242 N.E.2d 572 (1968).

In *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374 (6th Cir. 1968), the Court of Appeals for this Circuit recognized that the Supreme Court, in *Traveler's Health*, in the course of rejecting the contention that a state's power to regulate must be determined by a conceptualistic discussion of theories of the place of contracting or of performance," instead accorded great weight to the "consequences" of the contractual obligations in the state where the insured resided and the degree of interest that state had in seeing that those obligations were faithfully carried out."

In the present case, it is reasonable to have expected the defendants to have contemplated that the acts culminating in the completed transaction would create a sizeable partnership interest in Mr. Martin, an Ohio citizen, resulting in a continuing relationship between the defendants in Minnesota and Martin in Ohio. The relationship created was isolated, but not short-term. The State's interest in protecting its citizens with respect to such an investment is strong.

Finally, I believe it is noteworthy in this connection that the portion of the Act which plaintiff seeks to apply to the defendants is not punitive but simply permits the purchaser to rescind the transaction and puts the parties in the position they were in before the contract was entered into.

In sum, I believe that the contacts of the defendants with Ohio, taken together with the interest Ohio has to see that its citizens are protected in such a purchase of securities, and the rescissory nature of the statutory remedy, justify viewing the transaction in this case as occurring "in this State" for purposes of R.C. 1707.43. Accordingly, since plaintiff has tendered his subscription agreement to the defendants, they are jointly and severally obligated to refund to Mr. Martin the $100,000 he paid for it, together with court costs.

 Defendants argue at length that plaintiff's laches bars his right of rescission and that his continued acceptance of benefits (in the form of tax shelter) estops his recovery. These are equitable doctrines that apply in common law suits for restitution. Plaintiff's rescissory remedy in this case is governed by R.C. 1707.43. That provision sets a two-year statute of limitations on bringing suit pursuant to it. This indicates to me that the legislature considered the issue of a purchaser resting on its rights and chose to resolve that issue by the use of a two-year limitation rather than the equitable balancing inhering in a laches analysis. In any event, I believe that the bringing of suit within the two-year period set by law does not constitute laches.

Similarly, the statute sets forth the conditions under which a purchaser can be estopped from recovery. If, within two weeks of the sale, a purchaser receives an offer to rescind the transaction, and the purchaser fails to accept such offer of rescission within 30 days, the purchaser may not benefit from the statutory remedy. The statute says nothing of acceptance of benefits inuring indirectly to the purchaser by virtue of the sale pending an acceptance by the seller of the purchaser's offer to rescind. Indeed, invocation of R.C. 1707.43

does not invalidate the security itself, *see, Warren Peoples Market Co. v. Corbitt,* 114 Ohio St. 126, 151 N.E. 51 (1926); and it is reasonable to expect that until the sale has been legally rescinded, the buyer's ownership interest continues.

While the law stated by defendants is good contract law in the ordinary case of restitution, it is inapplicable to the statutory remedy because the statute provides only partial restitution. The statute provides for the exchange of the property interest conveyed for the original price paid for it, regardless of any change in value of the interest or any benefits that it may have conferred during the period it was held by the purchaser. Thus, the statute does not mandate the return of interest payments or dividends earned on a security, nor does it require the seller to pay an appreciated market value.

 Finally, while the statute requires suit to be instituted within the two years, it sets no time limit for a purchaser's tender of the interest sold and expressly provides that this may be done in open court. Thus, even if any previous offers to rescind were waived by subsequent actions, Martin's repeated offers in the pleadings of this case and at trial in open court would satisfy the statutory condition precedent to recovery. Mr. Martin's legal responsibilities under the Internal Revenue Code upon rescission of the transaction do not concern us here. As to the issues of this case, I hold that Martin's acceptance of tax benefits by virtue of his partnership interest after his request for rescission and before rescission is effectuated does not estop Martin from resort to the statutory remedy accorded by R.C. 1707.43.

### Conclusion

I conclude that plaintiff has failed to establish that defendants acted with the necessary scienter to prevail on claims stated in Paragraphs Three, Four, Five and Six of the complaint; that plaintiff's claim in Paragraph Two is barred by the applicable statute of limitations; and that plaintiff is entitled to restitution of the $100,00 paid

for the partnership interest under R.C. 1707.43 as stated in Paragraph One.

It is so ORDERED.